239 P.3d 255 (2010)
237 Or. App. 133
In the Matter of M.R.L., E.Y.L., Y.I.L., A.J.L., M.L.L., and S.E.L., Children.
STATE of Oregon, Petitioner-Respondent,
v.
N.L. and B.Z.L., Appellants.
00389604, 00389606, 00389607, 00389609, 00389611, 00389613; Petition Number J13025; A143877.
Court of Appeals of Oregon.
Argued and Submitted April 15, 2010.
Decided September 1, 2010.
*256 Shannon Storey, Deputy Public Defender, argued the cause for appellant N.L. On the brief were Peter Gartlan, Chief Defender, and Holly Telerant, Deputy Public Defender, Appellate Division, Office of Public Defense Services.
Ann Lechman-Su argued the cause and filed the brief for appellant B.Z.L.
Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before LANDAU, Presiding Judge, and ORTEGA, Judge, and SERCOMBE, Judge.
ORTEGA, J.
Father and mother appeal from a juvenile court judgment taking jurisdiction over their six children: M.R., born in August 1996; E, born in September 1998; M.L., born in July 2000; Y, born in January 2004; A, born in February 2007; and S, born in November 2008. After father and mother filed notices of appeal, the juvenile court entered a judgment amending the jurisdictional/dispositional judgment. As we explain below, we conclude that the juvenile court lacked authority to amend the judgment as it did; that father's trial counsel performed inadequately by misstating the law concerning the applicability of the Indian Child Welfare Act (ICWA); that, as to the juvenile court's finding of medical neglect, father suffered no prejudice as a result of counsel's performance; and that, as to additional findings required by ICWA, father did suffer prejudice. Because the jurisdictional/dispositional judgment did not comply with ICWA as to evidence and findings required under ORS 419B.340, we reverse and remand.
To determine which judgment is at issue on appeal, we begin with the procedural history. In July 2009, DHS was awarded protective custody of the children. In a subsequent shelter order entered later that month, the juvenile court determined that the children were Indian children under ORS 419A.004(13), which defines "Indian child" as a child who either (a) is a member of a tribe or (b) is eligible for membership and is the biological child of a member of a tribe. Father *257 is a member of the Choctaw Nation of Oklahoma, and the court found by clear and convincing evidence that the children were enrolled or eligible for enrollment. The court further found, by clear and convincing evidence, that removal from the home was in the children's best interest because the parents' continued custody was likely to result in serious emotional or physical damage to the children and that, under the circumstances, no efforts would have prevented the need for removal or made possible the return of the children.
The jurisdictional hearing was held in October. Near the end of the hearing, the court and counsel discussed the applicability of ICWA. A DHS caseworker testified that she had inquired of the Choctaw Nation whether the children were eligible for enrollment, had received conflicting information in response, and was gathering information to apply for enrollment; the Choctaw Nation did not intend to intervene until the children were enrolled. The caseworker believed that there was a "strong possibility" that they were eligible but that, "based on * * * letters from the Tribe, there is still some confusion about that matter."
The juvenile court made no findings about enrollment eligibility but did express concern about whether ICWA applied, which would trigger the requirements of proof by clear and convincing evidence and testimony from a qualified expert. ORS 419B.340(7). Counsel for all parties (father, mother, the children, and the state)apparently confused by the tribe's lack of interventionresponded by agreeing that the applicable evidentiary standard was a preponderance of the evidence. The court accordingly applied that standard and made oral findings that, under ORS 419B.100(1)(c), the children's conditions and circumstances were such as to endanger their welfare because mother and father had (1) failed to provide dental care, (2) failed to provide for the children's medical needs, and (3) failed to provide for their educational needs. The court noted that it would find medical neglect by clear and convincing evidence, if needed. The court subsequently entered a "Judgment of Jurisdiction/Disposition (Non-ICWA)." (Uppercase and boldface omitted.) Mother and father appealed, and father argued, in part, that the juvenile court had erred by failing to apply ICWA.
Meanwhile, after the entry of the jurisdictional judgment and the filing of the notices of appeal in this case, mother filed in the juvenile court a "Motion for Reconsideration of ICWA Ruling at Jurisdictional Hearing." She contended that the juvenile court had "the authority to correct an error or mistake at any time under ORS 419B.923, even during the pendency of an appeal." DHS also received information that the children were eligible for enrollment and that the Choctaw Nation intended to intervene. The juvenile court held a hearing on April 13, 2010 (two days before oral argument in the appeal of the jurisdictional judgment), decided that ICWA applied, and set a date for an evidentiary hearing under ICWA standards.
In this court, the state filed a notice of probable mootness, arguing that the juvenile court's actions mooted father's assignment of error concerning ICWA. Attached to that notice is an unsigned order stating, in part, that the juvenile court
"finds that at the original jurisdictional hearing, * * * the case should have been treated as an ICWA case pursuant to [ORS] 419B.878, because there was sufficient ambiguity on the record as to the applicability of ICWA, the underlying facts as to whether the children were in fact `Indian children' under the statute, and * * * the state concedes that there was `a suggestion of Indian heritage.'"
The state indicated that the parties had agreed to the order and that the juvenile court was expected to sign it on the morning of April 15. Although no party has provided this court with a signed copy of the order, OJIN indicates that, on April 15, the juvenile court signed an "Order grant counsel for mothers mo to reconsider." That caption corresponds to the caption of the unsigned order that was attached to the state's notice of probable mootness, which was "Order Granting Counsel for Mother's Motion for Reconsideration Regarding the ICWA Issue at Jurisdictional Hearing." (Uppercase omitted.)
*258 On June 1, the juvenile court held a hearing in which it heard qualified expert testimony from a Choctaw Nation social worker. The court then entered an amended judgment of jurisdiction; applying a standard of clear and convincing evidence, the court found that DHS had made active efforts and that mother and father had failed to provide for children's medical needs, thereby endangering their health and welfare.
After the entry of the amended judgment, the state filed in this court a supplemental notice of probable mootness, arguing that the amended judgment mooted father's assignment of error regarding ICWA. This court inquired about the juvenile court's authority to enter the amended judgment during the pendency of the appeal.[1] In response, father contended that the juvenile court lacked authority to do so. Mother and the state argued that the juvenile court had authority under ORS 419B.923(1)(c) because of newly discovered evidencenamely, statements from the Choctaw Nation that the children are eligible for enrollment. The state also argued that, under ORS 419B.923(8), the juvenile court had inherent authority to enter an order regarding ICWA and to modify the judgment.[2]
We conclude that neither of those asserted bases for entering an amended judgment during the pendency of the appeal is supported by the record before us and that the juvenile court lacked authority to enter that amended judgment. In some circumstances, ORS 419B.923 allows a juvenile court to modify or set aside an order or judgment after the filing of a notice of appeal:
"(1) Except as otherwise provided in this section, on motion and such notice and hearing as the court may direct, the court may modify or set aside any order or judgment made by it. Reasons for modifying or setting aside an order or judgment include, but are not limited to:
"(a) Clerical mistakes in judgments, orders or other parts of the record and errors in the order or judgment arising from oversight or omission. These mistakes and errors may be corrected by the court at any time on its own motion or on the motion of a party and after notice as the court orders to all parties who have appeared. During the pendency of an appeal, an order or judgment may be corrected as provided in subsection (7) of this section.
"(b) Excusable neglect.
"(c) Newly discovered evidence that by due diligence could not have been discovered in time to present it at the hearing from which the order or judgment issued.
"(2) A motion to modify or set aside an order or judgment or request a new hearing must be accompanied by an affidavit that states with reasonable particularity the facts and legal basis for the motion.
"* * * * *
"(7) A motion under subsection (1) of this section may be filed with and decided by the trial court during the time an appeal from a judgment is pending before an appellate court. The moving party shall serve a copy of the motion on the appellate court. The moving party shall file a copy of the trial court's order or judgment in the appellate court within seven days of the date of the trial court order or judgment. Any necessary modification of the appeal required by the court order or judgment must be pursuant to rule of the appellate court.[[3]]

*259 "(8) This section does not limit the inherent power of a court to modify an order or judgment within a reasonable time or the power of a court to set aside an order or judgment for fraud upon the court."
We begin with the applicability of ORS 419B.923(1)(c). Nothing in the record before this court suggests that the juvenile court modified its judgment on the basis of newly discovered evidence. At the jurisdictional hearing, the court did not make a factual finding concerning the children's eligibility for tribal enrollment, nor do we have any indication that, on mother's motion for reconsideration, the court intended to change any factual finding in response to new evidence. Although further information about the children's eligibility had been obtained, no one appears to have argued or presented evidence to the juvenile court that the children's eligibility for tribal enrollment (and thus their status as Indian children) "by due diligence could not have been discovered in time to present it" at the jurisdictional hearing, as required by ORS 419B.923(1)(c). Rather, the parties appear to have agreed that mistakes were made at the jurisdictional hearing and that the court should have applied ICWA based on the record at the time of that hearing. The juvenile court was not asked to modify the jurisdictional judgment on the basis of newly discovered evidence, nor did it do so.
We also reject the state's argument that amending the judgment was within the juvenile court's "inherent power" under ORS 419B.923(8). In general, under ORS 19.270, when a notice of appeal is served and filed, the trial court loses jurisdiction of the cause except as to certain limited matters. Here, nothing in ORS 19.270 or ORS 419B.923 provided a basis for the juvenile court to amend the jurisdictional/dispositional judgment under ORS 419B.923(8) after notices of appeal were filed. ORS 19.270 provides that a trial court retains jurisdiction to take certain actions, but deciding a motion under ORS 419B.923(8) is not among them.[4]
*260 ORS 419B.923(7) provides that a trial court may decide a motion under ORS 419B.923(1) during the pendency of an appeal, but creates no such exception for a modification of a judgment under ORS 419B.923(8). Nor does ORS 419B.923(8) itself create such an exception. Regarding the similar provision of ORCP 71 C, the Supreme Court has explained that the provision "is a reservation of inherent trial court authority, not a source of inherent authority." State v. Ainsworth, 346 Or. 524, 532, 213 P.3d 1225 (2009) (emphasis in original); see also Dept. of Human Services v. B. A. S./J. S., 232 Or.App. 245, 256-57, 221 P.3d 806 (2009), rev. den., 348 Or. 280, 230 P.3d 933 (2010) (examining legislative history of ORS 419B.923(8), noting that it was adopted from ORCP 71 C, and citing ORCP 71 C case law to support interpretation of ORS 419B.923(8)); cf. Patrick v. State of Oregon, 178 Or.App. 97, 106, 36 P.3d 976 (2001) (noting that trial court had modified judgment under ORCP 71 C before any party had appealed and thus "while it still retained full jurisdiction over the action").[5] We are aware of no source of authority for the juvenile court to enter the amended judgment in this case during the pendency of this appeal. Because the amended judgment is ineffective, we consider the original jurisdictional/dispositional judgment only.
Father makes five assignments of error regarding that judgment. In the first three, he challenges the juvenile court's findings that the children were within the jurisdiction of the court on the basis of the parents' neglect of the children's dental, educational, and medical needs. In the fourth, he contends that the juvenile court erred by concluding that ICWA did not apply and thus failing to make findings required under ICWA. While acknowledging that invited error generally is not a basis for reversal, father contends that his counsel's statement about ICWA's applicability was not a strategic choice and should not be attributed to him under the circumstances. Finally, in his fifth assignment of error, father contends that he received inadequate assistance from his trial counsel.
We begin with the fifth assignment of error because it frames our resolution of the other issues. We agree that the juvenile court erred by not applying ICWA at the jurisdictional hearingbut ordinarily, given the agreement of father's trial counsel that the court did not need to do so, we would conclude that the error was invited and thus not a basis for reversal. State ex rel Juv. Dept. v. S. P., 346 Or. 592, 606, 215 P.3d 847 (2009). Father, however, contends that his counsel was inadequate in that regard and that he should not be penalized for counsel's misstatement of the law; in his view, his counsel's statement was not a tactical decision, and no advantage could have accrued to father from it. We agree.
The statutory right to counsel includes a right to adequate counsel, and a claim of inadequate assistance may be raised for the first time on appeal. State ex rel Juv. Dept. v. Geist, 310 Or. 176, 185-87, 796 P.2d 1193 (1990) (so holding in a termination of parental rights proceeding); State ex rel. Juv. Dept. v. Charles/Austin, 106 Or.App. 628, 633-34, 810 P.2d 389, rev. den., 312 Or. 150, 817 P.2d 758 (1991) (applying the same principles in an appeal arising from a jurisdictional hearing); see also ORS 419B.205 (providing for appointment of counsel for parents). No one has disputed father's right to appointed counsel in this case. As the party asserting the inadequacy of counsel, father has the burden to show not only that his counsel was inadequate but also that the inadequacy prejudiced his cause. Geist, 310 Or. at 191, 796 P.2d 1193. As the Geist court explained, id., the standard for reversal is high:
"The bare assertion of trial counsel's inadequacy does not warrant a remand or reversal; *261 nor does a finding of inadequacy, standing alone, require a remand or reversal if, on de novo review of the record, the reviewing court is satisfied that the proceeding was fundamentally fair and that even with adequate counsel, the result inevitably, would have been the same."
Here, father's counsel performed inadequately by mistakenly telling the juvenile court that ICWA did not apply. In a case involving an Indian child, the court must comply with ICWA before finding the child to be within its jurisdiction. State ex rel. Juv. Dept. v. Cooke, 88 Or.App. 176, 178, 744 P.2d 596 (1987). On the record at the time of the jurisdictional hearing, the juvenile court should have applied ICWA. ORS 419B.878 (providing in part that "[i]f the court knows or has reason to know that an Indian child is involved, the court * * * shall enter an order that the case be treated as an Indian Child Welfare Act case until such time as the court determines that the case is not an Indian Child Welfare Act case"). Here, we can conceive of no strategic or tactical advantage that could have accrued to father from the application of the less stringent standards applicable to a non-ICWA case.
We next consider whether the result at the jurisdictional hearing would have been the same if father's counsel had asserted that ICWA applied. Geist, 310 Or. at 191, 796 P.2d 1193. As requested by father, we review de novo. ORS 19.415(3)(b); ORAP 5.40(8).[6] We conclude that, as to the finding of educational and dental neglect, the result would have been different (although a discussion of those issues would not benefit the parties or the bench and bar); that, as to the finding of medical neglect, the proceeding below was fundamentally fair and the result would have been the same; and that, as to additional evidence and findings required by ORS 419B.340(7), the result would have been different. Thus, although educational and dental neglect are not proper bases for jurisdiction in this case, medical neglect may be a proper basis for jurisdiction if, on remand, the requirements of ORS 419B.340(7) are satisfied.
We begin with the finding of medical neglect. Father contends that he did not neglect the children's medical needs and that the record is insufficient to show that he would neglect any future needs. We disagree. As the juvenile court orally found at the conclusion of the jurisdictional hearing, there is clear and convincing evidence that father and mother endangered the children by failing to provide for their medical needs. Father's and mother's inability to recognize the need for, or unwillingness to seek, the help of medical professionals has already created severe, lasting harm to some of the children and presents a risk of harm to any child in their care. Their protestations that they now would provide medical care are not credible.
Even relying only on mother's and father's testimony about the events leading to the children's hospitalization (and disregarding other accounts provided to medical staff), the record shows that mother and father have failed to seek medical help, even when they believed that the children suffered from serious medical conditions. DHS was awarded temporary custody in July 2009, after all six children were hospitalized. By that time, two-year-old A had a life-threatening case of meningococcemia. As a result of that infection, both of his lower legs and several of his fingers have been amputated, and he has undergone multiple skin grafts.[7] All of the *262 children were exposed to infection and treated for it; all could have ended up in the same condition as A.
Mother testified that, in the week or two before hospitalization, the family was sick with what they believed to be swine flu. Although five or six family members had racing heart rates, mother sought no medical care, because she believed from media reports that doctors did not want to see patients until the swine flu was over. Mother's expert, a registered nurse, testified that the Center for Disease Control had publicly advised people with suspected swine flu not to go to the hospital but to call a doctor for advice. She acknowledged that "[t]he key there is to call the doctor"something that father and mother never did.
Mother testified that, the day before the children were hospitalized, she became sick and collapsed, and E became sick soon after. Based on father's research, father and mother thought that E might have scarlet fever, which they believed to be a serious illness. They did not seek medical care.
A was the next to fall ill. According to mother, at midnight, A went from being energetic to lying down with a mild fever. Father testified that later, when he was told that A was "kicking, or something," he saw that A had purple spots and was having problems breathing. After checking A's throat and trying to cool A by rinsing him, father told mother to call 9-1-1 at around 2:30 a.m. While waiting for an ambulance, father had to put his fingers in A's throat to maintain an air passage while A was convulsing. When the ambulance arrived, mother accompanied A to the hospital, where she too was admitted to the intensive care unit.
After mother and A were taken to the hospital, M.L. complained that he had problems with his legs and was unable to walk. Father, who testified that he "was confused as to why [M.L.] couldn't walk," did not call 9-1-1 or arrange to take M.L. to the hospital. Later in the day, mother's aunt took father and the children to the hospital. All of the children except M.R. were admitted to the intensive care unit. By that time, E was delusional.
Dr. Leonhardt, a pediatrician who saw the children shortly after their hospitalization and later conducted evaluations of the four oldest children, testified that E was lucky to survive. S, Y, and M.L. had symptoms of bacterial meningitis and received treatment. Although M.R. did not display symptoms, he was admitted to the hospital because of exposure to the disease; Leonhardt thought that an illness that M.R. suffered the prior week might have been meningococcemia. Leonhardt also thought that, in A's case, an onset of the illness in two hours was not impossible, but it would be very surprising if his symptoms had developed that suddenly. In Leonhardt's view, even after the children were hospitalized, mother did not appreciate the severity of the situation.
Mother's and father's delays in seeking care before the children's hospitalization were consistent with a long-standing failure to seek medical care. Before the hospitalization, father and mother had obtained no medical care or check-ups for the children, except some vaccinations for only M.R. Father testified that vaccinations "just slipped my mind or something" and that he had not understood the need for check-ups. Mother testified that check-ups are unnecessary and that she has "very little trust for doctors."
Twelve-year-old M.R. had a congenital heart defect that typically would be found during the first year of life and repaired between ages two and five. In the hospital, the first person to listen to M.R.'s heart was able to identify a problem. M.R.'s subsequent surgery was less successful than would be expected for a younger patient. Long-term consequences of the lack of early treatment may include pulmonary hypertension and potential scarring of the heart and heart valves.
When M.R.'s surgery was scheduled, father opposed it. At the jurisdictional hearing, he testified that he had done so based on mother's representation that Leonhardt recommended waiting to do surgery until M.R. was 18 or 19 years old. Leonhardt's CARES *263 evaluation of M.R., however, noted the need for surgery and for follow-up with a pediatric cardiologist, and M.R.'s treating pediatric cardiologist testified to a lack of any medical literature favoring such a delay in treatment. The cardiologist testified that he had tried to explain to mother the need for early repair and that mother appeared not to understand.
Like M.R., 10-year-old E had unaddressed health concerns. She has an eye condition, strabismus, that can be treated in early stages with an eye patch or exercises but, if untreated, can cause an extreme loss of vision. E's strabismus was not treated and, as a result, she may need surgeryan outcome that would have been less likely if she had been seen by a pediatrician. Despite Leonhardt's explanation of the need for treatment, both father and mother believed that mother was adequately addressing the condition with eye exercises. Mother testified that professional care would not have helped E but "would have helped in this court case, because I could have proven that her eyes were not neglected, and I wouldn't be having this conversation." Father testified that, because mother had the same type of eye condition, he "do[es] a lot of consulting with [mother] on that." Father also testified that E had had a problem with fainting and that someone had suggested that she might have epilepsy, but those concerns had never been investigated by a doctor. Mother testified that E had fainted once, when father was medicating scratches on E's legs.
Father and mother testified that they now would seek medical care and check-ups for the childrentestimony that the juvenile court found not to be credible. The court also observed that neither parent displayed a sense of responsibility or emotion about what the children had suffered. We give considerable weight to the juvenile court's assessment of credibility. Geist, 310 Or. at 194, 796 P.2d 1193. On this record, even if father's counsel had asserted the applicability of ICWA, the result would have been the same as to the finding of medical neglect as a basis for jurisdiction. Father was not prejudiced with respect to that finding.[8]
Finally, we turn to the requirements of ORS 419B.340(7), which provides:
"When an Indian child is involved, the department must satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful. Foster care placement may not be ordered in a proceeding in the absence of a determination, supported by clear and convincing evidence, including the testimony of expert witnesses, that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical injury to the Indian child."
When the juvenile court entered the jurisdictional/dispositional judgment, the requirements of ORS 419B.340(7) had not been met. If the applicability of ICWA had been asserted, presumably the juvenile court would have proceeded in compliance with that statute. With respect to the requirements of ORS 419B.340(7), father was prejudiced. Accordingly, the juvenile court must address that issue on remand.
Reversed and remanded.
NOTES
[1] We also inquired whether the parties would enter into a settlement under ORS 19.410 that would allow this court to remand to the juvenile court for reconsideration and possible reentry of the amended judgment. The parties did not reach an agreement.
[2] The state also contends that an ICWA determination can be made at any stage of a child custody proceeding. The juvenile court's authority to apply ICWA to ongoing matters, however, is a separate issue from its authority to amend a judgment during the pendency of an appeal from that judgment.
[3] ORAP 2.22(2) provides:

"This subsection applies to a motion for relief from an order or judgment filed in juvenile court under ORS 419B.923 during the pendency of an appeal.
"(a) If the copy of the motion required to be served on the appellate court is not entitled `MOTION FOR RELIEF FROM ORDER OR JUDGMENT UNDER ORS 419B.923,' the copy shall be accompanied by a letter of transmittal identifying the motion as a motion for relief under ORS 419B.923.
"(b) Any party to the appeal may request the appellate court to hold the appeal in abeyance pending disposition of the motion or allow the appeal to go forward. In the absence of a request from a party, the court on its own motion will review the motion for relief from judgment and decide whether to hold the appeal in abeyance. If the court does not order the appeal to be held in abeyance, the appeal will go forward.
"(c) If the appellate court holds an appeal in abeyance pending disposition of a motion for relief from order or judgment and subsequently the court receives a copy of the juvenile court's order deciding the motion, after expiration of the period within which an appeal from the order may [be] filed, the appellate court will decide whether to reactivate the case or take other action.
"(d) A party wishing to appeal an order deciding a motion for relief from order or judgment under ORS 419B.923 during the pendency of an appeal shall file a notice of appeal within the time and in the manner prescribed in ORS chapter 19. The notice of appeal as filed shall bear the same appellate case number assigned to the original notice of appeal."
We remind practitioners of the importance of compliance with those rules.
[4] ORS 19.270 provides, in part:

"(1) The Supreme Court or the Court of Appeals has jurisdiction of the cause when the notice of appeal has been served and filed as provided in ORS 19.240, 19.250 and 19.255. The trial court may exercise those powers in connection with the appeal as are conferred by law, and retains jurisdiction in the matter for the following purposes:
"(a) Deciding requests for attorney fees, costs and disbursements or expenses pursuant to ORCP 68 or other provision of law.
"(b) Enforcing the judgment, subject to any stay of the judgment.
"(c) Deciding a motion for judgment notwithstanding the verdict under ORCP 63.
"(d) Deciding a motion for new trial under ORCP 64.
"(e) Deciding a motion for relief from judgment under ORCP 71 B.
"* * * * *
"(4) Notwithstanding the filing of a notice of appeal, the trial court has jurisdiction, with leave of the appellate court, to enter an appealable judgment if the appellate court determines that:
"(a) At the time of the filing of the notice of appeal the trial court intended to enter an appealable judgment; and
"(b) The judgment from which the appeal is taken is defective in form or was entered at a time when the trial court did not have jurisdiction of the cause under subsection (1) of this section, or the trial court had not yet entered an appealable judgment.
"(5) Notwithstanding the filing of a notice of appeal, the trial court has jurisdiction:
"(a) To enter an order or supplemental judgment under ORCP 71 or ORS 19.275, 107.105(4) or 107.452; and
"(b) To enter an order or supplemental judgment for the purpose of implementing a settlement as allowed by ORS 19.410(3)."
[5] ORCP 71 C provides:

"This rule does not limit the inherent power of a court to modify a judgment within a reasonable time, or the power of a court to entertain an independent action to relieve a party from a judgment, or the power of a court to grant relief to a defendant under Rule 7 D(6)(f), or the power of a court to set aside a judgment for fraud upon the court."
[6] ORAP 5.40(8)(d)(v) lists, as one of the reasons that this court may exercise its discretion to review de novo, "Whether the trial court made an erroneous legal ruling, reversal or modification of which would substantially alter the admissible contents of the record (e.g., a ruling on the admissibility of evidence), and determination of factual issues on the altered record in the Court of Appeals, rather than remand to the trial court for reconsideration, would be judicially efficient." Here, father's arguments regarding ICWA and the adequacy of his counsel implicate the standard of proof applicable to the proceedings whether a preponderance of the evidence or clear and convincing evidence. Reviewing this case de novo is more judicially efficient than remanding the entire case for reconsideration.
[7] After being admitted to the hospital on July 4, A remained hospitalized at the time of the jurisdictional hearing in mid-October. When A contracted pneumonia in the hospital, father complained that staff were not allowing A enough visitors; father asserted that his sister, a registered nurse, had told him that a lack of visitors and movement was contributing to A's pneumonia.
[8] Father also contends that he is entitled to a new trial on the entire jurisdictional petition. In his view, the findings required under ORS 419B.340(7) cannot be made separately from the finding of neglect. We reject that argument without further discussion.