***This is a nonprecedential memorandum opinion pursuant to ORAP 10.30 and may not be cited except as provided in ORAP 10.30(1).***

Submitted June 10, affirmed July 27, petition for review denied October 20, 2022 (370 Or 404)

In the Matter of K. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. L. M.,
aka S. L. D., aka S. L. G.,
*Appellant.*

Clackamas County Circuit Court
19JU08733; A176724

Todd L. Van Rysselberghe, Judge.

G. Aron Perez-Selsky and Michael J. Wallace filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jona J. Maukonen, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

Mother appeals from and seeks reversal of the judgment terminating her parental rights to her child, K, asserting two assignments of error. She assigns error to the juvenile court's order appointing a guardian *ad litem* (GAL) for her and to her lawyer's failure to request removal of that GAL at or before the termination of parental rights (TPR) hearing. And she argues that, because of the first two errors concerning the GAL, the judgment terminating her parental rights should be reversed. Mother does not otherwise challenge the merits of the court's judgment terminating her parental rights to K.

## I.  STANDARDS OF REVIEW

### A.  *Appointment of Guardian* Ad Litem

"[A]s to the appointment of the [GAL], 'we review the juvenile court's legal conclusions for errors of law, but are bound by the [juvenile] court's findings of historical fact so long as there is any evidence to support them.'" *Dept. of Human Services v. K. L. W.*, 253 Or App 219, 221, 288 P3d 1030 (2012) (quoting *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010)).

### B.  *Inadequate Assistance of Counsel*

We review claims of inadequate assistance of counsel to determine, as a matter of law, whether the proceeding below was "fundamentally fair." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 187, 796 P2d 1193 (1990). Here, mother has the burden to show that counsel was inadequate in failing to ask that the GAL be removed prior to the hearing and that, if he was, the inadequacy prejudiced her case. *Dept. of Human Services v. M. U. L.*, 281 Or App 120, 125, 380 P3d 1232 (2016) (*M. U. L. II*); *State v. N. L.*, 237 Or App 133, 142, 239 P3d 255 (2010).

We describe the factual context in which the decision to appoint a GAL for mother was made, as well as that which existed at the time the TPR hearing was held without a request to remove the GAL, in accordance with the applicable standard of review.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Mother began using drugs and alcohol when she was 12 years old. She "had not experienced a consistent period of sobriety" between that age and the point at which the juvenile court appointed a GAL for her three decades later when she was 42 years old. Mother has five children who ranged in age at the time of the GAL hearing from 23 years old to less than a year old, with K being four years old at that time. K was born prematurely and "tested positive for controlled substances" at birth. K was removed from mother's care three times and ultimately made a ward of the court after the juvenile court concluded that K was at risk of harm due primarily to mother's substance abuse and mental health issues, both of which interfered with mother's ability to safely parent K. K's siblings, S and L, are also in DHS custody and each had pending matters along with K's TPR case at the time of the GAL hearing.[1]

Mother has been diagnosed with polysubstance use disorder and adult antisocial behavior. Her IQ is in the average to low average range, but her "intellect is intact," and she identifies and spells words at above the twelfth-grade level and she computes arithmetic at the tenth-grade level. Standard psychological testing reflects that mother responds the way persons who are angry respond, making it difficult to interact with her on a personal level. Mother sent her DHS caseworker an average of 82 text messages a week after K had been made a ward of the court, and those communications demonstrated that mother did not understand the juvenile court dependency process or what she needed to do within that process to be reunited with her children. At one point, mother refused to return K to his foster care provider until after law enforcement agents intervened. At another point, she offered the caseworker money in exchange for K's return. Mother was hospitalized twice in January 2021 for acute psychiatric symptoms involving

---

[1]  In a related appeal, *Dept. of Human Services v. S. L. D.*, 321 Or App 128, ___ P3d ___ (2022) (nonprecedential memorandum opinion), also decided this date, mother appeals from a judgment establishing a permanent guardianship for S. In that case, she raises the same assignment of error challenging the appointment of a GAL for her, and, similarly, she challenges the failure of counsel to request removal of the GAL at or before the guardianship hearing. The dependency case involving L is not before us.

auditory and visual hallucinations, disorganized thinking, and impulsive behavior.

Mother retained counsel to represent her in this and the related matters, retaining at least one additional attorney as replacement counsel along the way. However, the attorney representing her in the months immediately leading up to the date scheduled for the TPR hearing was allowed to withdraw in late November 2020. At a status conference in early December 2020, the court inquired of mother about her ability to retain substitute counsel and she advised the court that she had the financial resources to do so. The court signed an order declining to appoint counsel for her in this TPR case, and mother was encouraged by the court to retain substitute counsel at three additional status check hearings set for that purpose. The court emphasized the need for mother to retain counsel without delay in light of upcoming trial dates in January and March in the pending dependency, guardianship, and TPR cases.

Mother had not retained counsel by the time of the January 13, 2021, status conference. After advising the court that it had become aware that mother had been hospitalized the week before that status check for acute psychiatric symptoms involving auditory and visual hallucinations, disorganized thinking, and other symptoms, DHS suggested the potential need to have a GAL appointed for mother. Mother advised the court that she planned to proceed *pro se* if necessary, but the court cautioned her against that:

> "THE COURT:   So the concern about representing yourself is if you are not a trained attorney, there's a number of issues that you could miss, a number of possible defenses or avenues of inquiry or other mechanisms in court that if you are not familiar with those, you may miss out. You may end up with a very, you know, dis—at a great disadvantage, because the rest of the people in this case are represented by attorneys that are very capable, and we do have to follow the rules of evidence in these sorts of cases. And the ultimate goal of the State is to terminate your parental rights or have a guardianship arranged based on whichever child it is.

"[Mother]:   Absolutely. Absolutely. Uh-huh.

"THE COURT:   So the—so the stakes are very, very high. I could not recommend more to have an attorney. I don't know that, you know—

"[Mother]:   (Indiscernible) of evidence versus beyond a reasonable doubt. Is that what you're talking about?

"THE COURT:   Well, it's actually a higher burden than preponderance, and I think you need to understand those distinctions. And if you don't understand them, you don't understand the law, you could be at an extreme disadvantage and lose the rights to your children, which is extraordinary. So I highly recommend that you get an attorney to assist you *** on these matters. It is ex—it is extremely important, and I'm—I am—I just cannot overstate that."

The court went on to discuss other matters, including visitation for mother with L, when mother added:

"[Mother]:   So may I intervene for a minute?

"THE COURT:   Well—

"*****

"[Mother]:   So I haven't found an attorney yet, because I've kind of done the footwork. You know, I've been having the same song and dance with you guys for what, a number of years now, and I've done my footwork and I know the parameters of this. So I don't understand why we continue to [waste] time, people, dollars, to maintain the charade.

    "I am the best mom that I can be for my children. And I—and the agency is blocking me from bonding, (indiscernible)—it's holding me back professionally, personally (indiscernible) all the way around. And I have done absolutely nothing to deserve to be treated in this regard by the State.

"*****

"[Mother]:   Oh, and pardon me. I (indiscernible) substantial drug—drug and alcohol evidence as written proving that I'm not even using drugs, where I'm being forced to stroll half naked at 6 o'clock. I've been doing this for years. There is no grounds to substantiate this additional kidnapping of my daughter."

The court concluded the remote video hearing shortly there-after.

      On January 27, 2021, at the next status conference, also conducted by remote video technology, DHS advised the court that it had received some of the hospital records and that it appeared that there had been "multiple psychiatric hospitalizations." DHS had, thus, filed a written motion to appoint a GAL arguing that mother "lack[ed] substantial capacity, due to a mental disability or impairment, either to understand the nature and consequences of the proceeding or to give direction and assistance to an attorney on deci-sions the parent must make in this proceeding." The court then had this discussion with mother:

> "THE COURT: All right. Thank you. So do you—have you had a chance to see the motion that [counsel for DHS] was referring to, the motion to appoint a guardian ad litem on your behalf?
>
> "[Mother]: Yeah.
>
> "THE COURT: All right. And do you have—do you—are you—do you want the Court to conduct a hearing to deter-mine whether that motion should be granted?
>
> "[Mother]: Okay. Could you tell me what the guardian ad litem is?
>
> "THE COURT: I'm not able to give you any sort of legal advice. So I'm just asking you, do you want a hearing so the Court can make a decision on that?
>
> "[Mother]: I guess. I mean, I don't really—I don't really understand what this is about, so this is outside of my com-fort zone.
>
> "THE COURT: All right. That's all right. Thank you.
>
> "* * * * *
>
> "All right. And, [Mother], we're going to continue this mat-ter at 9 o'clock, so you'll need to be available to participate tomorrow. If you're not here, the Court will go forward in your absence, so I strongly encourage you to make sure you are joining us tomorrow at 9 o'clock.
>
> "[Mother]: Okay.
>
> "THE COURT: All right.

"[Mother]:   I'll be there, Your Honor.

"THE COURT:   Thank you.

"[Mother]:   Okay.

"THE COURT:   That's all for this afternoon.

"[Mother]:   All right. Thank you."

Mother did not appear for the hearing at the scheduled time and, although court staff tried to reach her to connect her to the remote video hearing, they were not successful, and the court proceeded with the hearing in her absence. Text messages received as Exhibit 54 at the later June 3 TPR hearing reflect that the DHS caseworker, Evans, had been engaged in an ongoing conversation with mother, by text message, at the time of the January 28, 2021, hearing on the motion to appoint a GAL, encouraging mother to call in for the hearing. That same exhibit reflects mother's awareness of the ongoing hearing at the time of the hearing.

DHS presented evidence in support of the motion consisting of mental health treatment records from the hospitals in which mother was treated in January 2021, emails and text messages that mother had sent to her DHS caseworker, and the sworn testimony of Evans. Evans essentially testified that she had frequent communications with mother, including face-to-face, and by telephone, email, and text message, and that it became evident to her that mother did not understand the dependency process—its objectives and its requirements of mother—regardless of those communications. Evans testified at length about her interactions with mother, which included, among other things, descriptions of mother's statements that DHS had kidnapped her children, that the judge had done something "that could cost [the judge's] professional license," offering money for the return of her children, reporting "auditory hallucinations," that "voices were telling her to kill herself," and indicating that she had not slept for many nights. Evans testified that the communications were at times nonsensical and that they often reflected an inability on mother's part to understand or accept the impact of her behavior on her children, what was required of her in the dependency process, and notably,

the significance of her behavior on her ability to be reunited with her children.

Evans described the information in the hospital records from mother's admission in the weeks just prior to the GAL hearing, including the diagnoses "underlying bipolar illness," and a "history of psychostimulant use that may be worsening symptoms," and information about the placement of involuntary mental health holds. Evans also described a text message she had received from mother demanding the return of one of her children within 30 minutes of her discharge from the second hospitalization.

The juvenile court ruled from the bench, finding that DHS had established, by a preponderance of the evidence, the necessary elements required for appointment of a GAL for mother to protect mother's interests, and it later signed a written order reflecting its findings and appointment of a GAL for mother. After the court concluded its ruling and began to move on to other matters, mother was connected to the hearing. In fact, Exhibit 54, received into evidence at the subsequent TPR hearing, includes mother's reply to Evans at 10:21 a.m. on the day of the GAL hearing with the question, "What was the verdict or result of court?" Evans advised mother, by reply text message, that the hearing was still ongoing and asked if mother wished for the court to call her. Mother answered, "Yea," and she was connected to the court hearing at that time, joining it after the court had granted the motion. After the court advised mother that it had proceeded with the hearing in her absence, it went on to other matters. Mother interjected:

> "[Mother]:   Your Honor, for efficiency purposes, all that I'm really looking for is, like, a date, time, and place to pick up my children. Really that's all that I'm looking for. So I just wanted to put that out there.
>
> "THE COURT:   All right. So noted."

The court concluded by informing mother that it had appointed a GAL "on your behalf to protect your rights." Mother's response was "[o]kay," and the court recessed.

The hearing on the TPR petition occurred approximately six months later, on June 3, along with the related

guardianship proceeding concerning S. No further motions were made concerning the GAL, who attended the hearing on mother's behalf, with mother present, and with mother's court-appointed counsel. At the time of the hearing, a number of exhibits were received into evidence, including medical records, drug treatment records, and numerous email and text message exchanges. Most notably were test results from a hair follicle test conducted on a hair specimen collected from mother on January 22, 2021, that was positive for amphetamines and methamphetamines, and a series of text message and email exchanges between mother and Evans that contained additional statements by mother that were concerning. In particular, mother sent an email dated March 20, 2021, to all counsel involved, including her own attorney as well as the GAL that was appointed for her, that essentially proposed that they negotiate for the return of her children. In that email, mother suggested that she use "[her] magic in a productive way," and stated that she wanted to "take the burden off of the 'foster parents' to bite the bullet and order the immediate return of [her] 3 children[.]" Mother wrote further that she was "willing to pay real money to the physical custodians" to resolve the matter. The record contains additional written exchanges of similar content and approach by mother continuing up through the end of May 2021, just before the TPR hearing took place.

III.   APPOINTMENT OF GUARDIAN *AD LITEM*

We begin with DHS's argument that mother did not preserve her assignment of error directed to the court's order appointing a GAL on her behalf. Mother concedes that she did not preserve that assignment, but she contends that preservation was not required because the court plainly erred in appointing a GAL for her, and she asks us to exercise our discretion to review that plain error. DHS responds that the court did not err, but that even if it did, it did not do so plainly and that we should not review such error here. We agree with DHS that, on this record, the court did not plainly err in appointing a GAL for mother in the first instance and, accordingly, we reject mother's first assignment of error without further discussion.

## IV.   CONTINUING WITH GAL AT TPR HEARING

Turning to mother's second assignment of error, DHS concedes that preservation is not required for "challenges to the adequacy of dependency counsel." We agree. *See Dept. of Human Services v. T. L.*, 358 Or 679, 686-87, 369 P3d 1159 (2016) (citing *Geist*, 310 Or at 184 n 9) (concluding that a parent may raise a claim of inadequate assistance of counsel for the first time on direct appeal from a judgment terminating parental rights).

Mindful of the Supreme Court's cautionary missive that it is a "rare" case where the question of counsel's adequacy "will not require the development of an evidentiary record," *T. L.*, 358 Or at 702, we conclude that this is one of those rare cases where the record is sufficiently developed for us to conclude that counsel's failure to request removal of mother's GAL was not due to counsel's inadequate efforts on her behalf. As mother correctly notes, ORS 419B.234(5) requires a parent's attorney to "inquire at every critical stage in the proceeding as to whether the parent's competence has changed" and, if appropriate, "request removal of the [GAL]."[2] As earlier described, the record contains evidence of mother's continued mental health issues and inability to appreciate the nature and consequences of the proceeding right up until the time of the TPR hearing. In at least one email exchange that mother sent to her GAL and to her attorney, mother demonstrated her lack of understanding by proposing to negotiate for the return of her children with the payment of "real money" to the foster providers. If read in isolation, one might wonder whether mother's proposal was serious. But when that email is read in conjunction with all the other emails and text messages that she wrote, it would have been readily apparent to mother's attorney that, at that point, mother did not have the capacity to understand the nature and potential consequences of the proceeding.

Mother does not point to any evidence in the record to suggest that her attorney was not paying attention to

---

[2] ORS 419B.234 has been amended since mother's GAL hearing. However, because those amendments do not affect our analysis, we refer to the current version of the statute in this opinion.

her communications or that her attorney had not assessed mother's continuing need for a GAL during the time leading up to and including the TPR hearing. Unlike *M. U. L. II*, 281 Or App at 127-28, the evidence here does not establish that mother had stabilized prior to the hearing, and it does not include evidence from medical or mental health treatment providers that mother had regained her ability to "aid and assist" her attorney in this or any other matter. As mother correctly notes, a drug screen conducted at the second hospitalization in January 2021 was negative for all controlled substances, which was consistent with her report to hospital staff of "recent sobriety." But that negative drug screen must be considered along with all the other evidence, which includes the January 22, 2021, positive hair follicle drug test, scheduled drug screens that mother did not attend, and three decades without "a consistent period of sobriety." The record in this case really leaves no room for the possibility that mother's mental disability or impairment had resolved or stabilized to the point that she had gained the ability to understand the proceeding or its potential consequences or that she could ably direct her attorney and make the decisions she would be called upon to make in this legal proceeding.

As mentioned earlier, mother does not challenge the merits of the court's decision to terminate her parental rights beyond her assignments of error directed to the appointment and continuation of the GAL. Had she done so, we would have been required to review that decision *de novo*. ORS 19.415(3)(a). We note, nevertheless, that given mother's questions about the fundamental fairness of the TPR proceeding, we have reviewed the record in its entirety, and it is clear that mother's attorney argued against termination as mother wished, presenting evidence and using language consistent with mother's views of the case as reflected in her own emails and text messages. For example, mother's attorney included the following in her closing argument to the court:

> "Your Honor, [the GAL] spoke really eloquently about the emotional cost to [Mother], and I want to—I want her to hear me say that I acknowledge that this process has not been kind to her, especially the last month of it

with two trials that are really emotionally difficult to sit through.

"She does feel that her children have been kidnapped. I know—I know those of us that are involved in the law and involved in child welfare all the time understand that legally that's not what happened, but it doesn't make the feeling for her any less real. She feels that they've been ripped from her life and that she's—and she simply doesn't have a chance to get them back."

Contrary to mother's assertions on appeal, the TPR hearing was fundamentally fair. And, given that, we conclude that the trial court did not err as mother claims it did in either of her two assignments of error.

Affirmed.