Argued and submitted May 17, affirmed October 24, 2012, petition for review allowed February 13, 2013 (353 Or 208)

In the Matter of L. J. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. L. W.,
*Appellant.*

Jackson County Circuit Court
080108J;
Petition Number 080108JB9;
A149505 (Control), A149915

288 P3d 1030

Megan L. Jacquot argued the cause and filed the briefs for appellant.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the briefs

were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Father appeals the juvenile court's corrected order appointing a guardian *ad litem* and stipulated judgment terminating his parental rights as to his daughter, L, on the ground of unfitness, ORS 419B.504. Father advances two assignments of error. First, father contends that the juvenile court erred in appointing a guardian *ad litem* to represent him pursuant to ORS 419B.231 because he was able to properly give direction and assistance to his attorney on decisions related to his termination proceeding. Second, father contends that, because the appointment of a guardian *ad litem* was unnecessary, the juvenile court erred in allowing the guardian *ad litem* to stipulate to the judgment terminating his parental rights; father also argues that, in doing so, the court violated his due process right to fundamental fairness. For the following reasons, we affirm.

We begin with our standards of review. Neither party suggests that, because the appointment of the guardian *ad litem* occurred in conjunction with a termination of parental rights proceeding, as permitted under ORS 419B.231(1), our review of the facts is *de novo*. *See* ORS 19.415(3)(a) ("Upon appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall try the cause anew."). Instead, the parties agree that we have discretion to review *de novo* father's first assignment of error related to the juvenile court's appointment of a guardian *ad litem*, ORS 19.415(3)(b), and father does not request that we exercise our discretion to review that appointment *de novo*. Given the parties' positions on appeal, we will assume that we have discretion to conduct a *de novo* review, but we decline to exercise that discretion. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Therefore, as to the appointment of the guardian *at litem*, "we review the juvenile court's legal conclusions for errors of law, but are bound by the court's findings of historical fact so long as there is any evidence to support them." *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). With respect to father's second assignment of error, although we review *de novo* the juvenile court's stipulated judgment to terminate father's parental rights, ORS 19.415(3)(a), here, the only question

presented is a legal one, which we review for errors of law. Accordingly, we state the facts consistently with the juvenile court's conclusions.

L was born in 1996. In 2005, father and mother divorced, and mother was awarded custody of L while father had parenting time on alternate weekends. After mother died, father assumed care for L for a period of time. In 2007, father began exhibiting symptoms of paranoid delusion and was admitted to Providence Hospital for two weeks. For that reason, the Department of Human Services (DHS) subsequently filed a petition for jurisdiction, and the juvenile court established jurisdiction on the ground that the "condition or circumstances are such as to endanger the welfare" of the child, ORS 419B.100(1)(c). Father then agreed to attend parenting classes and to undergo a psychological evaluation.

In 2009, Dr. Morrell, a clinical psychologist, conducted a comprehensive psychological evaluation of father. In the evaluation report, Morrell indicated that father has a "circumscribed fixed delusional disorder" that persists "more than likely due to [father's] noncompliance to antipsychotic medication." In addition, Morrell conducted cognitive testing, which revealed that father has a low average verbal intellect, but an average nonverbal intellect, and he tends to ramble and vacillate possibly due to "a combination of [his] modest verbal intellect, defensive thinking[,]" possible neurologic impairment, and "confusion related to his delusional disorder." Morrell ultimately concluded that, based on the collective data, L "is more probably than not at risk for damaging effects accruing from her father's continuing and poorly modifiable parenting impairment."

At some point, L was placed with her current foster family but continued to visit her father at DHS's visitation center. After L indicated to DHS that she wanted to be adopted by her foster family, in 2011, DHS filed a termination petition on the grounds that father was "unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into father's home is improbable within a reasonable time." DHS alleged in the termination petition, among other things, that father suffered from "[a]n emotional illness, mental illness, or mental deficiency of

such nature and duration as to render the parent incapable of providing care for extended periods of time."

DHS later filed a motion for appointment of a guardian *ad litem* for father, arguing that he lacked substantial capacity due to his mental disability or impairment either "to understand the nature and consequences of the proceeding or to give direction and assistance to his attorney on decisions a parent must make in [the termination] proceeding[,]" ORS 419B.231(2)(a)(A). In support of its motion, DHS submitted an affidavit stating that father was diagnosed with a delusional disorder and had made numerous rambling statements about a man named George Gardiner, whom father blamed as the reason for many of his problems. DHS contended that father appeared to be distracted and preoccupied with numerous delusional beliefs, and those beliefs, in turn, interfered with his ability to understand the current termination proceedings and to provide his attorney with the necessary information for him to receive a termination trial.

In August 2011, the juvenile court held a hearing on DHS's motion for the court to appoint a guardian *ad litem*. DHS contended that a guardian *ad litem* was necessary because it was difficult to keep father "on point" due to his delusional disorder. Father's counsel opposed the motion, arguing that she felt confident that father understood the nature of the termination proceeding.

At the hearing, DHS called two witnesses, father and Morrell. During the proceeding, father was able to correctly testify to the following: his age, the date and time, the name of the current president, the parties in the courtroom and their function, the address of the courthouse, the time when he last saw L, and the names of L's foster parents. Father had difficulty, however, with answering and focusing on certain questions, and both his counsel and the court interrupted his testimony several times, reminding him to focus on the questions being asked. For example, when counsel for DHS asked whether father told Fall, a DHS worker, that somebody was out to destroy him, father stated, "Sir, if you're being chased by guns and dogs at night in O'Brien or around Cave Junction, you'd be worried about who's after you." When the

court later asked father to clarify his answer, father tried to tie the explanation back to Gardiner, but was unable to explain how Gardiner was related to his previous statement about being chased by "guns and dogs." After father discussed his relationship with Gardiner, the court reminded father that the purpose of the hearing was to "figure out if [he] had the mental ability to assist in [his] representation," and the purpose was not "just to talk about stuff."

On cross-examination, father's counsel asked him several questions regarding father's knowledge of what generally happens during a termination trial. Father explained that at a termination trial the judge must determine, based on admissible evidence, "whether or not you're able to parent the child." And father explained that he understood his rights during a termination trial, stating that he is able to testify, call witnesses, and cross-examine the state's witnesses. Father also testified as to the instructions he had given his attorney regarding his then-pending termination trial, explaining that he wanted to have a termination trial, take the stand at trial, cross-examine witnesses, and call Dr. Phillips, his former psychiatrist, as his primary witness. He indicated that the reason he wanted a termination trial was to show his daughter that he "care[d] for her." Father also acknowledged that if he did not prevail at the termination trial, L would be adopted by her foster family.

Morrell also testified at the hearing. Morrell commented on his observations of father's testimony during the hearing. Morrell indicated that father's delusional disorder made him tangential, causing him to veer off from the topic, but that delusional disorder, in general, does not "have pervasive effects on all areas of functioning" and does not spill "into all areas of life in a deleterious way." Morrell concluded, however, that father's delusional disorder would interfere with his ability to make decisions about contesting a termination:

> "There are individuals, in fact probably about half the time, there are individuals who are pretty knowledgeable about the legal aspects of the case, but at the same time, they essentially, with all due respect, represent more of a problem to their attorney than * * * a solution or an aid[ ].

My observations again, * * * as [father was] trying to answer the questions for the Judge, as well as for [his] own attorney was that they essentially had to override [his] input to get an answer. I saw [his] attorney, and * * * she was trying to sort of * * * push [him] beyond the answers that [he was] giving so that she could help [him] to help [himself]. And I think that, in my mind, is probably the biggest impediment in terms of the psychiatric state. I think it is true that [father's] delusional disorder will certainly have relevance in terms of the termination[ ] proceedings, and his ability to parent this child, but I think that his fixation with that and his tendency to go off topic, will mean that his attorney, in my estimation, will continue to have to work in spite of his contribution to the case, in order to represent him, and I obviously would see that that would meet the definition of not, incapable of aiding and assisting."

Based on his observations, Morrell determined that father was unable to act in his own best interest.

At the end of the hearing, the juvenile court granted DHS's motion to appoint a guardian *ad litem*, stating:

"My concern is that [father], in a nutshell, I think [father] can understand the mechanics well enough, but for some reason [father] go[es] off on these tangents, and to an extreme level or tangent that makes [it] impossible for [father] to stay on track with what's going on here."

The juvenile court assured father that, despite the appointment of a guardian *ad litem*, he would receive a trial. But when father's counsel raised the concern that a guardian *ad litem* could sign relinquishment papers and take away his right to trial, the court responded,

"But the question for me is, did I find by preponderance of the evidence that your client lacks a substantial mental capacity to understand [and] pursue the proceedings that are in front of him right now. And I'm convinced that he does not have the capacity to fully understand and direct your efforts in this regard."

The juvenile court subsequently entered a corrected order appointing a guardian *ad litem*, relying on two alternative grounds: (1) father's disability and impairment rendered him unable to understand the nature and consequences of the termination proceeding; and

(2) father's disability and impairment rendered him unable to give direction and assistance to his attorney on decisions that father must make in that proceeding.

Shortly thereafter, father's guardian *ad litem* agreed to stipulate to the allegations in DHS's petition to terminate father's parental rights.[1] At the settlement hearing, the guardian *ad litem* gave two reasons why he agreed to the stipulation. First, the guardian *ad litem* concluded that, based on his experience, it was unlikely that father would prevail at his termination proceeding, stating that, if father were competent, he would "understand * * * and take the advice of [his] competent attorney that his chances were practically nonexistent to win." Second, he took into consideration that, pursuant to a mediation agreement between father and DHS, for father to continue contact with his daughter, father could not contest his termination petition.[2]

During the settlement hearing, father's attorney stated that she signed the stipulated judgment because it was her duty to follow the guardian *ad litem*'s directions. And when father attempted to talk to the judge, the court explained that father did not have "standing" at the hearing and that only the guardian *ad litem* could say something on his behalf. The guardian *ad litem* did not say anything on father's behalf. The juvenile court subsequently entered the stipulated judgment, and father's parental rights with respect to L were terminated.

On appeal, father assigns as error the juvenile court's granting of DHS's motion for an appointment of a guardian *ad litem* and entering the guardian *ad litem*'s stipulation to terminate father's parental rights. In his combined argument, father makes three points. First, father

---

[1] Father requested a stay of the termination of parental rights proceeding because father had appealed the appointment of the guardian *ad litem*, but the court denied the stay.

[2] We note, however, that the mediation agreement is not in the record and that there is no evidence in the record establishing that father, or father's guardian *ad litem*, and the potential adoptive parents intended to pursue an agreement to allow for some type of ongoing contact between father and L. Instead, the stipulated judgment states that the guardian *ad litem* understood that the "stipulation is not conditioned or contingent on any mediated agreement * * * that the father will have any ongoing contact with the child."

contends that the appointment of the guardian *ad litem* was invalid. Second, because the guardian should not have been appointed, the guardian's consent to the stipulated judgment, which terminated his parental rights over his objection, was also invalid.[3] Lastly, father argues that, whether or not the appointment of the guardian *ad litem* was invalid, he was denied his due process right to fundamental fairness. We address father's arguments in turn.

In a juvenile dependency proceeding, a court may not appoint a guardian *ad litem* for a parent unless the court finds the following by a preponderance of the evidence:

"(a) Due to the parent's mental or physical disability or impairment, the parent lacks substantial capacity *either* to understand the nature and consequences of the proceeding *or* to give direction and assistance to the parent's attorney on decisions the parent must make in the proceeding; and

"(b) The appointment of a guardian ad litem is necessary to protect the parent's rights in the proceeding during the period of the parent's disability or impairment."

ORS 419B.231(4) (emphasis added). Accordingly, the court may appoint a guardian *ad litem* when the parent's impairment prevents the parent from understanding what is happening or helping the parent's lawyer in the lawyer's representation of the parent. Both of those functions are necessary for a parent to act in his or her interests and to make critical decisions in a termination proceeding. *See State ex rel Juv. Dept. v. Cooper*, 188 Or App 588, 598 n 7, 72 P3d 674 (2003) (it is the parent's role and responsibility, not the lawyer's, to make critical decisions, and if the parent lacks understanding of the proceeding or cannot make those decisions, a guardian must be appointed) (citing *People in Interest of M. M.*, 726 P2d 1108, 1120 (Colo 1986)). However, if the parent lacks some mental capacity, but is able to make decisions and to communicate with and act on the advice of his or her counsel, then the appointment of a guardian *ad litem*

---

[3] Generally, a party may not appeal a stipulated judgment unless that judgment "specifically provides that the party has reserved the right to appellate review of a ruling of the trial court," ORS 19.245(3)(a), and, in this case, the stipulated judgment does not reserve such a right. However, DHS concedes that father may challenge the validity of his consent to the stipulated judgment. *Brown and Shiban*, 155 Or App 238, 241, 963 P2d 105 (1998), *rev den*, 328 Or 594 (1999).

is unnecessary because the guardian "could provide little, if any, service to the parent, that would not be forthcoming from counsel." *M. M.*, 726 P2d at 1120 (Colo 1986).

Father's arguments on appeal focus on whether the trial court erred in finding that father was unable to adequately assist and direct his counsel during the termination proceeding. Although father admits that his responses were tangential when he answered questions related to Gardiner, he asserts that there is evidence in the record that he was able to make decisions related to his potential termination trial and had adequately expressed those decisions to his attorney. Those decisions were that he wanted a trial because he did not want to relinquish his parental rights; he wanted to demonstrate to his child that he cared for her; he wanted to testify at trial; he wanted to call his former psychiatrist as his primary witness; and he wanted an opportunity to cross-examine the state's witnesses.

DHS argues, however, that there is sufficient evidence in the record to support the court's finding that father was unable to aid and assist his counsel, and the court's appointment of a guardian was necessary to protect father's rights during the proceeding. According to DHS, father's rambling testimony illustrates that he was confused as to the purpose of his hearing. And although father was able to give instructions to his counsel, DHS contends that some of father's instructions were not in his best interest.

We agree with DHS that the record contains sufficient evidence to support the court's finding that father's disability rendered him unable to direct and assist his counsel. In his psychological evaluation, Morrell concluded that father lacked the ability to assist his attorney, given that he had a tendency to ramble due to a combination of his delusional disorder and his modest verbal intellect. During the hearing, father did ramble when answering questions related to his relationship with Gardiner, and, consequently, his counsel had to repeatedly interrupt his testimony, reminding him to stay focused on the questions being asked. And, when father was asked by the court to explain how some of his responses related to Gardiner were relevant

to his hearing, father was unable to do so adequately. In fact, father seemed confused as to the very purpose of the hearing, although the court had explained to him, on several occasions, that the hearing was not to determine whether he was competent to parent his daughter or to allow father to talk about irrelevant subjects, but rather to determine whether he needed a guardian *ad litem* appointed for him.

And, to the extent that the court found that father's tendency to ramble affected his ability to direct and to assist his counsel, we conclude that there is evidence to support it. Morrell testified that father's delusional disorder and tendency to veer off topic would make it difficult for his counsel to represent him during his termination proceeding, concluding that father's counsel would have to help him focus on the questions being asked and "push" him to properly answer those questions. Morrell opined that, although father could make some decisions regarding what he wanted at his termination trial, due to his delusional disorder, father was unable to act according to his best interests. Accordingly, we conclude that there is sufficient evidence in the record to support the court's finding that father was unable to direct and to assist his counsel, and the court did not abuse its discretion in appointing a guardian *ad litem* for father.[4]

We turn to whether the guardian's stipulation to terminate father's parental rights was otherwise valid. DHS relies on *Cooper* for the proposition that, because the appointment of the guardian *ad litem* was valid, the guardian *ad litem* had the authority to stipulate to the termination judgment.

In *Cooper*, we addressed whether the juvenile court could adjudicate the merits of a termination petition when

---

[4] As we noted at the outset of the opinion, neither party suggests that our review of the facts pertaining to the appointment is *de novo*. But, even if a *de novo* standard of review were required, we would conclude that the court did not err in appointing a guardian *ad litem* for father. We give some deference to the trial court's findings regarding father's incapacity based on the court's interaction with and observations of father in the courtroom. *See State v. Smith*, 71 Or App 205, 212 n 8, 692 P2d 120 (1984) ("[I]n a mental illness case, the circuit court's opportunity to view appellant's demeanor may be critical in reaching a conclusion as to his mental state."). Based on the court's observations that, during his testimony, father was tangential to an "extreme level," under a *de novo* standard we would conclude that father was unable to direct and assist his counsel.

the mother failed to personally appear at the pretrial hearing, but the mother's guardian *ad litem* requested a trial on her behalf. 188 Or App at 595. We determined that, when a guardian *ad litem* is appointed for a parent, "it is the function and responsibility of a guardian *ad litem* to appear on behalf of, and represent the interests of, the incapacitated person." 188 Or App at 598. We noted, however, that the guardian *ad litem* does not represent the parent "for all purposes." *See id.* (noting that in *Christman v. Scott*, 183 Or 113, 117-18, 191 P2d 89 (1948), a case involving the appointment of a guardian *ad litem* for a "deranged person," the Supreme Court held that an action is properly prosecuted in the name of the deranged person and does not belong to the guardian *ad litem*). Ultimately, we concluded that, for the purposes of ORS 419B.917, which requires personal appearance by a parent, the guardian *ad litem*'s appearance and assertion of the mother's right to trial on her behalf constituted an appearance by the mother. *Id.* at 599; *see also State ex rel Dept. of Human Services v. Sumpter*, 201 Or App 79, 85, 116 P3d 942 (2005) ("[T]he guardian *ad litem* * * * has the legal authority to waive the right to a trial.").

Shortly after our decision in *Cooper*, the legislature enacted ORS 419B.234, which sets out the duties of a guardian *ad litem* in the juvenile dependency context.[5] Or Laws 2005, ch 450, § 3. Under ORS 419B.234, after a guardian *ad litem* is appointed, the guardian *ad litem* must "[m]ake legal decisions that the parent would ordinarily make concerning" the termination proceeding. ORS 419B.234(3)(b). In making decisions on behalf of a parent, the guardian *ad litem* must consult with the parent, if possible, and with the parent's attorney and "make any other inquiries as are appropriate to assist the guardian ad litem." ORS 419B.234(3)(a). Moreover, the guardian *ad litem* must make decisions that are "consistent with what the guardian ad litem believes the parent would decide" if the parent did not lack substantial mental capacity. ORS 419B.234(4).

---

[5] Because neither party cited ORS 419B.234 in their briefs, we requested supplemental briefing to address the following questions: (1) "Does ORS 419B.234 apply in this case?"; and (2) "If it does, how does it apply?"

In its supplemental brief, DHS asserts that, although the guardian *ad litem* acknowledged that father did not want to waive his right to a termination trial and stipulate to the termination, the guardian *ad litem* had the authority to agree to terminate father's parental rights. According to DHS, father's resistance to agreeing to the stipulation was the result of his inability to understand the consequences of the proceeding or the advice of his attorney. DHS contends that, if father were competent, he would have agreed to the stipulation, and, pursuant to ORS 419B.234(3), the guardian *ad litem* had the authority to stipulate to terminating father's parental rights.

Father does not rely directly on the statutory provisions set out in ORS 419B.234 in support of his challenge to the stipulated judgment, conceding that he did not preserve for appeal an argument based on the statute. Father also does not dispute that, once appointed, the guardian *ad litem* had statutory authority to stipulate to terminating father's parental rights.[6] Instead, father reprises his argument that he was denied his due process right to fundamental fairness. DHS argues, however, that father did not preserve his due process argument because he did not make any constitutional arguments in response to either the motion to appoint the guardian *ad litem* or the entry of the stipulated judgment. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court.").

Although we agree with DHS that, in the juvenile court, father did not raise his due process argument that he now seeks to raise on appeal, we conclude that, in this case, father did not have an opportunity to raise his objections after the guardian *ad litem* was appointed. *See Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008) (the preservation requirement is inapplicable "if the record establishes that preservation would have been futile, because the trial court would not have permitted an issue to be raised or the record to be developed"). The juvenile court determined that father did not have standing to raise his objections to the stipulation and that father would have to raise his objections

---

[6] We do not decide whether ORS 419B.234(3) grants that authority.

through the guardian *ad litem*, but the guardian *ad litem* declined to say anything during the termination proceeding on father's behalf. As a result, father was unable to raise his due process argument below, and we are not constrained by the rules of preservation from reviewing his argument on appeal.

We now turn to the merits of father's procedural due process argument.[7] The permanent termination of parental rights is "one of the most drastic actions the state can take against its inhabitants," such that the court's termination of parental rights must be achieved consistently with due process. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 186, 796 P2d 1193 (1990). Due process requires that the court's procedural safeguards ensure that a termination proceeding is fundamentally fair. *Id.* at 187. For a termination proceeding to be fundamentally fair, the court must provide parents with a meaningful opportunity to be heard. *See id.* at 189-90 ("The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner."); *State ex rel Juv. Dept. v. Evjen*, 107 Or App 659, 663-64, 813 P2d 1092, *rev den*, 312 Or 526 (1991) (concluding that the opportunity to be heard does not "translate into an absolute right to be *physically* present," but does mean that the parent must be allowed to participate "in *some* form" (emphasis in original)). And we have held that a parent is afforded a meaningful opportunity to participate in a termination proceeding through a guardian *ad litem*. *Cooper*, 188 Or App at 601.

Father argues that he was denied his due process right to fundamental fairness in two respects. First, father contends that he was denied due process because the juvenile court's appointment of the guardian *ad litem* was invalid. We reject father's argument without further discussion because we have already determined that the court did not err in appointing the guardian *ad litem* for him.

Second, father asserts that he was denied due process because there is no evidence in the record that the guardian *ad litem* consulted with father, as required by ORS

---

[7] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, "[N]or shall any State deprive any person of life, liberty, or property without due process of law * * *."

419B.234(4), before he agreed to waive father's right to trial. According to father, ORS 419B.234 authorized the guardian *ad litem* to stipulate to the termination petition, over father's objection, provided that the guardian *ad litem* believed that the reason for father's objection was due to his disability or impairment. But because there is no evidence in the record establishing that the guardian *ad litem* ever consulted with father to determine why he wanted a termination trial, father asserts that the termination proceeding was fundamentally unfair.

Father relies on three cases in support of his due process argument, *Lehman v. Lycoming County Children's Services*, 458 US 502, 513-14, 102 S Ct 3231, 73 L Ed 2d 928 (1982), *Santosky v. Kramer*, 455 US 745, 769-70, 102 S Ct 1388, 71 L Ed 2d 599 (1982), and *Geist*, 310 Or at 186-87. Father does not separately discuss each case, but cites them to support his general proposition that, in a termination proceeding, due process requires fundamental fairness.

Although we agree with father's proposition that due process requires a termination proceeding to be fundamentally fair, father does not further develop his argument. Father does not explain how *Lehman*, *Stantosky*, or *Geist* support his argument that, given an absence of proof that the guardian *ad litem* consulted with father, father was somehow denied due process. *See Lehman*, 458 US at 513-14 (the Supreme Court concluded that a federal writ of habeas corpus should not be extended to a parent's challenge to state-court judgments terminating parental rights, partly because of the need for finality in child-custody disputes); *Santosky*, 455 US at 769-70 (in a termination proceeding, due process required the state to support its allegations by at least clear and convincing evidence); *Geist*, 310 Or at 185-87 (holding that, "[a]bsent an express legislative procedure for vindicating the statutory right to adequate counsel," the court may review a parent's challenge to the adequacy of his or her appointed counsel on direct appeal). As previously noted, father concedes that he did not preserve any statutory argument that, pursuant to ORS 419B.234(4), the guardian *ad litem* failed to consult with father. And father does not dispute that, once appointed, the guardian *ad litem* had the authority to stipulate to terminating father's parental

rights over his objection. Thus, we can only speculate as to how father was denied due process once the guardian *ad litem* was properly appointed. Accordingly, we conclude that, because father does not further develop his due process argument, we are unable to review it on appeal.[8]

In sum, we conclude that the juvenile court did not err in appointing a guardian *ad litem* for father. And because father does not dispute that the guardian *ad litem* had the authority to stipulate to the termination, 253 Or App at 231, we conclude that the juvenile court did not err in entering the stipulated judgment terminating father's parental rights.

Affirmed.

---

[8] We note that our holding is limited to father's argument presented on appeal. Father does not argue that ORS 419B.234 does not authorize a guardian *ad litem* to stipulate to the termination judgment or that any such authority violated his due process rights. And father does not contend that, because the guardian *ad litem* stipulated to terminating his parental rights, thereby depriving him of a fundamental liberty interest, due process required that the court's appointment of the guardian *ad litem* be supported by a higher standard of proof, *i.e.*, by clear and convincing evidence rather than preponderance of the evidence. Father also does not argue that due process required the juvenile court, *sua sponte*, to ensure that, once appointed, the guardian *ad litem* complied with his statutory obligations owed to father, including consultation with father before entering the stipulation. Nor does father suggest, along the lines of *Geist*, that, because ORS 419B.234 does not provide a procedure for father to challenge the guardian *ad litem*'s failure to comply with his statutory obligations, this court should provide such a procedure. Had father specifically presented and developed those types of arguments, we would have been in a position to consider them.