Argued and submitted January 2, vacated and remanded April 23, 2014

In the Matter of A. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. C. P.,
*Appellant.*

Clackamas County Circuit Court
110449J;
Petition Number 110449J02;
A154836 (Control)

In the Matter of J. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. C. P.,
*Appellant.*

Clackamas County Circuit Court
110450J;
Petition Number 110450J02;
A154837

324 P3d 633

Megan L Jacquot argued the cause and filed the brief for appellant.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Duncan, Judge, and DeVore, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Mother appeals, challenging the juvenile court's denial of her motion to set aside her relinquishments of parental rights to her two children.[1] She contends that she signed the relinquishments under duress and that the juvenile court erred when it denied her motion, failed to appoint new counsel, and did not allow mother to present testimony on the issue of duress. We do not reach the merits of mother's motion to set aside the relinquishments because we conclude that the court's findings in support of its denial of the motion were based, in large part, on testimony by mother provided to the court without the assistance of counsel, which violated her due process right to a fundamentally fair hearing. Accordingly, we vacate and remand for further proceedings.

The relevant undisputed facts are largely procedural. In 2011, the juvenile court took jurisdiction over mother's two children pursuant to ORS 419B.100. The children, who were then three and five years old and who have special developmental and medical needs, were placed in foster care. On September 25, 2012, mother, represented by counsel, appeared for a hearing regarding the termination of her parental rights. At that point in time, the Department of Human Services (DHS) had identified the foster parents as the adoptive placement for children. The foster parents and children's attorney were present at the September 2012 hearing.

The court took some time at the outset to inform mother of how the trial would proceed, what her rights were, and what factors regarding parental rights the court would consider. The court emphasized that it would also consider the overall question of what was in the best interests of the children and recounted a recent case where it had found that the content of psychological evaluations and the fact that children had special needs to be particularly important factors when it determined parental rights. The court announced that it would break and allow mother to talk with her attorney and the state's attorney for as long as she wanted. Before the break, the court also told mother that her attorney had been involved in many trials and was "very experienced."

---

[1] The relinquishments were made under the provisions of ORS 418.270.

During the break, mother went into the jury room with her attorney, the state's attorney representing DHS, the DHS caseworker, the Court Appointed Special Advocate (CASA) for children, and children's attorney, and ultimately signed a relinquishment of her parental rights along with a certificate of irrevocability for both children. The state's attorney informed the court that the state would dismiss the termination petition. She added that she

"wanted to let the Court know that the State of Oregon certainly recognizes and commends *** mother for the thought process. She was very careful in making her decision. Given her past history, this was a very difficult decision for her. And it's not one that I think she took lightly today."

Mother's attorney agreed, saying that he "would thank the State and [children's attorney] for getting involved and maybe explaining in a little bit different terms my client's options. It was very helpful for all of us to be in the same room and talk together." Mother's attorney also noted that mother and the foster parents had agreed on mediation regarding post-adoption communication and visitation rights.

Children's attorney reported some of the terms of the relinquishment and the proposed mediation: that the mediator would arrange for the exchange of written communications between mother and children, such as letters, school records, and school photos; that children's therapists would recommend whether personal contact with mother would occur; and that, if children did not have a therapist, one would be engaged to determine whether contact was in children's best interests and, if so, in what form. He pointed out that he had "explained to *** mother that this basically then puts it in the hands of therapists for the kids, rather than any of the parties in terms of determining what kind of contact the kids should have with their mother." Mother's attorney added that "one of the issues is—with the therapist would be how bonded the children are to their mother and whether contact, continued contact, and what that would look like would be in the children's best interest. And we are trying to take that into consideration through the mediation process."

The mediation process did not go smoothly. At a hearing on May 16, 2013, the foster father remarked to the

judge that it had "been a rough couple of months with the mediation." Soon after mother signed the relinquishments, DHS arranged a "goodbye" visitation between mother and children. Afterward, however, mother attempted to resume visitation with children based on her belief that visitation rights had been agreed upon when she signed the relinquishments. DHS and the CASA opposed any visitation. To try to resolve the visitation issue, DHS arranged for a counselor to interview children and the foster parents to evaluate whether visitation would be in children's best interests. The counselor recommended against further visitation, stating that "it would be detrimental to [children]'s emotional well-being."

Mother signed a mediation agreement on March 11, 2013, which did not provide for any visitation between mother and children in the short term, but which allowed for visitation in the future if children's therapists determined that it would be in children's best interests based upon their emotional readiness. The foster parents were reluctant to sign the mediation agreement. Mother's attorney requested a hearing to address the visitation issue, which was held on April 16, 2013, in the court's chambers. The matter was not resolved, and mother's attorney raised the possibility of filing a motion to set aside the relinquishments unless the foster parents signed the mediation agreement. The foster parents eventually signed it.

On May 31, 2013, mother filed a motion to set aside the relinquishments, stay the adoption proceedings, and request a new termination of parental rights trial. Attached to the motion was mother's affidavit, which stated that she believed that her "signature was entered under duress and was not freely, voluntarily, and intelligently given." Mother's attorney moved to withdraw as counsel and attached an affidavit in support of the motion stating that there had been a "breakdown in the attorney client relationship which makes it impossible for me to represent * * * [m]other further" and that the attorney-client relationship could no longer exist for reasons that could not be disclosed without violating client confidentiality for certain communications between him and mother. He also stated that there was an irresolvable ethical conflict because of the motion to set aside the relinquishment

and that he had been advised by the state that he would be called as a witness regarding mother's motion.

On June 17, 2013, the court held a hearing on mother's motion and on her counsel's motion to withdraw. The court remarked that the withdrawal motion was dependent on the motion to set aside the relinquishments. The court asked mother's attorney, "[w]ithout getting into any confidential communications," to explain what the motion to set aside the relinquishments was about. Mother's attorney answered that he could not go into details without mother's consent but that mother's contention was that she was coerced. When the court asked mother whether she would allow her attorney to disclose details, mother did not answer; instead, she expressed that she wanted to read aloud a letter that she had written to the court. The court asked to see the letter, which mother acknowledged was "not complete," and the court asked mother if it could ask her questions "directly." Mother answered, "Yes."

The court then read aloud mother's letter:

"* * * I hear the adoption was going to close in a few short months. I realize I made a mistake signing my rights. I was intimidated because of being told by [my appointed attorney], and [the DHS caseworker], that I wouldn't win at my trial, in their deepest opinion. Going along with what they said, [state's attorney]. At the time, I really believe what all these authorities were saying. I had no one to represent me except [my attorney], * * * who didn't believe in my innocence.

"As of so, he excused himself at the last minute on May 31, 2013. More going base off his belief and opinion at the time— at the same time, seeming like he wanted to help. Yet, little did I realize until later, I was just being strung along.

"I was told if I lost, which I would, that I would never see my children again unless I sign and that [the foster parents], agreed to do mediation.

"Now I know [my attorney] has mentioned in another letter he wrote you earlier that I stated I was forced to sign the relinquish rights. That is not true. I said I felt pressured. And in so many other words, coerced.

"I also felt that I was being coerced into signing the mediation."

The court directly asked mother why she felt pressured or coerced into signing the mediation agreement. Mother responded by saying, among other things, that "there's some circumstances of it that's been manipulated, and believed, and not investigated and not shown to be true" and that she had felt pressured because she felt that her attorney had misinformed her and was not forthcoming about the circumstances of the mediation process.

Mother asked the court if she would get a new attorney. The court replied, "Not as of today, no. I'm getting an understanding of what the basis is for your request. And since I understand it, I'll be able to make a decision, at this point, on whether or not you're entitled to have a new trial." On June 27, 2013, the court issued its findings in a letter opinion supporting the denial of mother's motion to set aside the relinquishments, stay the adoption proceedings, and request a termination of parental rights trial:

> "Having carefully considered the statements of mother at the June 17, 2013 hearing and her written materials and after reviewing the court file and listening to the recording from the September 25, 2012 hearing, the Motion to Set Aside Relinquishments is denied.

> "Although * * * mother now claims to have been pressured and coerced when she signed the relinquishment documents, the 'Release and Surrender' document states, 'I have read this document, know and fully understand its contents, and sign it of my own free will, without undue influence from anyone, and only after prolonged and solemn deliberation.' The 'Certificate of Irrevocability and Waiver' also states, 'I have read this certificate, know and fully understand its contents, and execute it of my own free will.' In addition, at the September 25 hearing, before she signed the relinquishment documents, the court advised her that she had a right to trial, to question witnesses who would testify against her, the right to testify herself and to call her own witnesses. The court slowly explained to her what type of factors are considered in a termination of parental rights case. The court then recessed for 1.5 hours to allow mother time to decide whether to proceed to trial. She was told that the decision was her decision and that she could ask any questions she might have.

"[M]other has politely and respectfully asked for a trial. However, the court concludes that her request is essentially based on 'second thoughts' and regret over the decision. That is not a valid basis for setting aside the relinquishments. She made a calculated decision on September 25, 2012—not one resulting from undue pressure. Even if one could interpret her decision to relinquish as conditioned on participation in mediation to determine the extent of contact with the children, that condition has been fulfilled.

"In light of the court's decision, [mother's counsel]'s motion to withdraw * * * is moot."

Mother appeals, arguing that at the June 17, 2013, hearing, where the court considered her motion to set aside the relinquishments, the lack of adequate counsel to assert the issue of duress deprived her of her due process right to a fundamentally fair hearing. The state responds that it was within the court's discretion to deny mother's motion to set aside the relinquishments and that, because the denial of the motion made moot mother's attorney's motion to withdraw, the trial court did not err with regard to the issue of mother's legal representation. The question we decide here is whether the disposition of mother's motion was made without the assistance of counsel and, if so, whether the absence of attorney representation deprived her of her due process rights in the June 17, 2013, proceeding.

The statutory provision that governs mother's relinquishments and the certificate of irrevocability is ORS 418.270. ORS 418.270(1) provides for the surrender and release of guardianship and control of children to a private child-caring agency for purposes of adoption.[2] DHS has the same authority under that statute as a private child-caring agency. ORS 418.285. ORS 418.270(2) provides that signing

---

[2] ORS 418.270(1) provides, in part:

"If licensed for such purposes by the Department of Human Services, a private child-caring agency may receive children from their parents or legal guardians for special, temporary or continued care. The parents or guardians may sign releases or surrenders giving to such agencies guardianship and control of the persons of such children during the period of such care, which may be extended until the children arrive at legal age. Such releases do not surrender the rights of such parents or guardians in respect to the adoption of such children and do not entitle such organization to give consent to the adoption of the children unless the release or surrender expressly recites that it is given for the purpose of adoption."

a release and surrender alone does not sever or terminate a child's relationship with his or her parent: the severance of family ties of adopted children can only be accomplished ultimately by court order. *Dept. of Human Services v. J. L. J.*, 233 Or App 544, 549, 226 P3d 112 (2010). "Importantly, no provision of the statutes at issue purports to limit the juvenile court's jurisdiction or authority over a child who is the subject of a release [under ORS 418.270]." *Id.*

The rules for irrevocability of a release or surrender are set forth in ORS 418.270(4):

> "Parents or legal guardians of children whom they have by release or surrender agreement given into the guardianship of incorporated child-caring agencies for the purpose of adoption may, concurrently or subsequently and without any adoption proceeding having been initiated, agree that the release or surrender shall become irrevocable as soon as the child is placed by the agency in the physical custody of a person or persons for the purpose of adoption by them, and waive their right to personal appearance in court in matters of adoption of such children, by a duly signed and attested certificate. From and after such physical placement for adoption such certificate of irrevocability and waiver and the release or surrender *may not be revoked by the parent or guardian unless fraud or duress is affirmatively proved.*"

(Emphasis added.) Thus, ORS 418.270 allows for the relinquishment of a parent's custody of her children for the purpose of adoption and, after placement,[3] prohibits the parent from revoking the relinquishment unless the parent can prove that the release and surrender were made under conditions that constitute fraud or duress.

---

[3] The release and surrender become irrevocable only after DHS (in this case) have "placed" the children in the physical custody of the adoptive parents. ORS 418.270(4). A placement of a child in a home with the understanding that the child will be adopted once that child is legally able to be adopted is deemed a "legal risk placement." OAR 413-110-0000; OAR 413-110-0010. A "legal risk placement" is considered a placement for the "purpose of adoption" under ORS 418.270(4) concerning irrevocability. OAR 413-110-0050. The designation of "legal risk placement" is not in effect until DHS "accepts all required documents." OAR 413-110-0030. Thus, a release and surrender is not irrevocable until DHS has accepted "all required documents" required for a placement under ORS 418.270. Mother raises the point on appeal that the record is unclear if or when DHS accepted "all required documents." Because here we vacate and remand the case for further proceedings, we need not resolve that point.

In the context of determining whether the court correctly disregarded mother's attorney's motion to withdraw and proceed with the hearing regarding mother's motion to set aside relinquishments, we recognize that "[p]arental rights are of paramount importance" and, accordingly, that "proceedings affecting those rights must comport with due process." *State ex rel Juv. Dept. v. Burris*, 163 Or App 489, 495, 988 P2d 414 (1999) (citing *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 187-90, 796 P2d 1193 (1990)). In *Geist*, the Supreme Court held that due process requires a termination proceeding that is "fundamentally fair." 310 Or at 189-90. We have held that fundamental fairness is also required in other juvenile dependency situations that implicate parental rights. *See State v. N. L.*, 237 Or App 133, 143, 239 P3d 255 (2010) (concluding that a jurisdictional hearing was not fundamentally fair because counsel was inadequate); *Burris*, 163 Or App at 495 (considering whether failure to provide notice for a preliminary status conference that led to a default establishment of the court's jurisdiction over a mother's children was fundamentally fair).

"The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner." *Geist*, 310 Or at 189-90 (citing *Mathews v. Eldridge*, 424 US 319, 333, 96 S Ct 893, 47 L Ed2d 18 (1976)). Factfinding procedures, such as "[t]he requirements of notice, adequate counsel, confrontation, cross-examination, and standards of proof," are essential to fundamental fairness. *Id.* However, fundamental fairness is not rigidly applied, but is "flexible and calls for such procedural protections as the particular situation demands." *Id.*[4]

---

[4] In *Geist*, the Supreme Court relied on the United States Supreme Court's consideration of three factors for analyzing a due process claim under the Due Process Clause of the Fourteenth Amendment. 310 Or at 189-90. The Court described those factors as follows in *Mathews*:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

424 US at 335.

Here, mother was represented by counsel that had been appointed for her when DHS sought to have the court establish jurisdiction over children. *See* ORS 419B.205 (providing for the appointment of counsel for a parent or legal guardian "whenever the nature of the proceedings and due process so require"). Mother's attorney continued to represent her during the proceeding to terminate her parental rights and mother's signing of the relinquishment agreements. *See* ORS 419B.518 (requiring the appointment of counsel in termination of parental rights proceedings if the parent is financially eligible). When she signed the relinquishments, mother agreed to participate in mediation to determine the circumstances under which she would be allowed to visit children; mother's counsel continued to represent her for the mediation and the court's review hearings after DHS's dismissal of the petition to terminate her parental rights.

Although mother's attorney was present at the hearing on June 17, 2013, the circumstances required her to proceed without attorney representation. At that hearing, the court asked mother if she would allow her attorney to disclose confidential details that could shed light on the duress issue. Mother did not answer, but instead provided the court with a letter that she had written without her attorney's help. After reading the letter aloud, the court directly questioned mother. Her attorney did not intervene, object, or otherwise provide any assistance to mother during the court's questioning regarding factual matters that related to the motion to set aside the relinquishments and her claim of duress. Indeed, the motion to withdraw indicates that mother's attorney had a number of reasons for his view that he was prevented from representing mother: a breakdown in the attorney-client relationship "mak[ing] it impossible for [him] to represent [m]other further," that the attorney-client relationship could no longer exist because of reasons that could not be disclosed because of attorney-client privilege and confidentiality, and that the state had notified him that he would be called as a witness regarding the duress claim. The court continued with the hearing, nonetheless, compelling mother to proceed without any counsel despite her expressed wish to have the court appoint a new attorney.

The court's denial of mother's motion to set aside the relinquishments implicated mother's parental rights: it left in place the surrender of parental rights, allowing mother only minimal or no contact with children as determined by a mediation agreement that she contends is not what she agreed to when she signed the relinquishments. Because the relinquishments were signed in lieu of continuing with the termination of parental rights hearing, her interest in determining whether the relinquishments were voluntarily given required the procedural safeguard of attorney assistance. Without that assistance, mother was left to represent herself. Her self-representation calls into question whether the facts and legal arguments relevant to her claim of duress were properly presented to the court. That situation indicates that mother did not have "the opportunity to be heard at a meaningful time and in a meaningful manner." We therefore conclude that, in those circumstances, the determination of mother's motion to set aside the relinquishments was made without the procedural protections required for a fundamentally fair hearing.

Vacated and remanded.