Argued and submitted July 1, 2014, judgment terminating mother's parental rights reversed and remanded, otherwise affirmed May 6; father's petition for review denied August 20, 2015 (357 Or 640)

In the Matter of S. R. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060700;
Petition Number M3J060700, D4J060700;

In the Matter of C. L. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060701;
Petition Number M3J060701, D4J060700;

In the Matter of M. J. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060702;
Petition Number M3J060702, D4J060700;

In the Matter of S. M. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060703;
Petition Number M3J060703, D4J060700;

In the Matter of S. R. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060704;
Petition Number M3J060704, D4J060700;

In the Matter of A. D. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.-M.
and M. D. M.,
*Appellants.*

Washington County Circuit Court
J060705;
Petition Number M3J060705, D4J060700;
A155378

350 P3d 207

Sarah Peterson, Deputy Public Defender, argued the cause for appellant A. S.-M. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant M. D. M.

Inge D. Wells, Assistant Attorney-in-Charge, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Garrett, Presiding Judge, and DeVore, Judge, and Schuman, Senior Judge.

GARRETT, P. J.

## GARRETT, P. J.

In this consolidated appeal, mother and father appeal judgments terminating their parental rights to their six children. As to father, we affirm the juvenile court's determination that father is unfit and that termination of his parental rights is in the best interests of the children. As to mother, however, we conclude that she was deprived of a fundamentally fair termination proceeding, in violation of her rights under the Fourteenth Amendment to the United States Constitution, because the juvenile court appointed a guardian *ad litem* (GAL) for mother without sufficient legal basis. We, therefore, reverse and remand the judgment terminating mother's parental rights for further proceedings.

We begin by describing the circumstances under which the Department of Human Services (DHS) came to be involved with this family and which led DHS ultimately to petition to terminate mother's and father's parental rights. We then discuss the proceedings below, including the juvenile court's appointment of a GAL against mother's wishes and the testimony regarding the current circumstances of the children and the services that were offered to both parents. We conclude that the juvenile court lacked a sufficient factual basis for concluding that mother was unable to provide direction and assistance to her attorney, as required by the GAL statute. Thus, even though DHS ultimately presented considerable evidence of mother's unfitness as a parent, the erroneous appointment of a GAL deprived mother (as the state acknowledges) of the opportunity to control her participation in the case. That violation of mother's right to due process fatally infected the termination proceeding and requires reversal.

Mother and father met in 1997 in a drug-treatment program. Their first child, Si, was born in June 1998, followed by C, in June 2000, and twins, M and Sh, in August 2001. Mother and father married in 2002. Their fifth child, Sa, was born in December 2004. Their sixth child, A, was born in October 2006.

DHS first became involved with the family in March 2006, when parents had a domestic dispute that led to father's conviction for fourth-degree assault. In late November 2006,

DHS received calls that the family was "absolutely out of control." Allegations included unsanitary living conditions, child neglect, and mother's aggressive and threatening behavior and possible drug use. When DHS caseworkers and law enforcement officers went to the home one evening, mother was verbally aggressive and defensive. Father, who was not home at the time, was reached by telephone during DHS's visit and said that he and mother had been drug-free for 11 years. However, a week later, when DHS arranged for father's probation officer to administer urinalysis tests (UA), father tested positive for cocaine. DHS caseworker Schiffner left the home after visiting mother with "huge concerns about [mother's] mental health and wellness." All six children were removed from the home in early December 2006 and were eventually returned to mother and father in 2008 after they had successfully completed recommended services.

In February 2011, DHS again removed the children, following an incident where mother went to a domestic violence shelter because father had threatened to "slit her throat." When DHS contacted mother, she denied any physical violence and said that she had "misheard" father and lied to the shelter because she needed a place to stay. Schiffner described mother's emotions during the conversation as "cycling" through being calm to crying to yelling. When contacted, father also denied any physical violence towards mother. DHS created a protective plan for the children, and they stayed with family friends for about one week.

During the next several weeks, DHS received reports of additional domestic disputes, as well as a phone call from someone who said that mother and father had recently taken the children to church and asked for other members of the church to "take the children because [mother and father] could no longer manage them." All six children were placed in DHS foster care in April 2011. The juvenile court entered judgments of jurisdiction over the children in May 2011. Both parents were subsequently offered psychological evaluations, but they refused to participate.

Initially, mother and father visited with all six children at once. However, visits with the twin boys, M and Sh,

who have severe emotional, learning, and behavioral problems, were eventually conducted separately with the twins' therapist. The record reflects that visits ranged from positive to very negative interactions between parents and the children. DHS records indicate that father and mother arrived for at least one visit smelling of alcohol; at another visit, both parents smelled of marijuana. Father also tested positive for various drugs on multiple occasions. Mother was emotionally volatile during the visits, with bouts of anger, sadness, and crying. Caseworker Salas described that mother "showed a high degree of paranoia and frantic behavior," particularly when DHS attempted to mediate mother's interactions with the children. The two older girls chose not to participate in several visits because of their parents' behavior.

Visits with Si, C, Sa, and A were terminated in February 2012, after DHS concluded that, while it had tried "every level of intervention" to make visits safe, the visits had continued to "spiral[] out of control," and the children "were not feeling any benefit" from them. Parents' visits with the twins, M and Sh, were terminated in May 2012 after a violent altercation took place. During that incident, Sh (who was 10 at the time), became erratic and violent towards caseworkers, his therapist, and himself. Sh ran into traffic on a busy street, said that he wanted to "slit his throat and end it all," and was handcuffed and taken to a nearby hospital by police officers. DHS records reflect that, during the incident, mother and father yelled at DHS workers and police and disregarded their instructions. Subsequently, the twins' therapist discontinued service to the family because she considered the "risks involved" to be "too great."

DHS records demonstrate that mother's treatment providers found her emotional outbursts difficult to handle; one provider concluded that, due to mother's history of being "inappropriate and emotionally abusive" to treatment providers, it was "highly unlikely" that any treatment provider would be successful with her.

DHS filed petitions in October 2012 to terminate mother's and father's parental rights to the six children. Mother received a neuropsychological evaluation by

Dr. Kolbell in November 2012.[1] Kolbell diagnosed mother with depression and a personality disorder. Kolbell described mother's relationship with father as "quite pathologic, yet, nevertheless, enduring" and also noted that mother was "highly unlikely" to "achieve any reliable and durable distance, physically and/or psychologically, from [father], which conceivably could create a context for her own therapy and change." Kolbell concluded that mother's prognosis for change was "poor, particularly with respect to those circumstances that have brought the children into care at various points and remain presently." He continued:

> "She has had multiple resources and efforts made available, and she has apparently systematically sabotaged each of these efforts, which ultimately have prevented her changing. It is highly unlikely that any further treatment or intervention would be productive.
>
> "* * * * *
>
> "* * * [S]he is not a viable resource for parenting at this time, and I foresee no significant improvement or change irrespective of any additional intervention, within the next twelve to twenty-four months."

Kolbell evaluated father in December 2012, during which father did not present evidence of any "prominent mental illness," although Kolbell concluded that father likely had an antisocial personality disorder. Kolbell also noted that father "made thinly veiled threatening statements related to his children." Specifically, father told Kolbell that the oldest daughters, Si and C, "should not try to find [him] if they're adopted" because father did not know what he would "do if they show up."

---

[1] Although it was not discussed at trial, mother received an earlier psychological evaluation from Dr. Basham in October 2011. Basham observed that mother "[s]howed labile moods, at times being highly confrontational and argumentative, but at other times vulnerable and emotional" and that mother presented "strong feelings that others do not understand her." Basham also stated that mother "lacks sufficient personal awareness of her emotions to adequately control them." Overall, Basham concluded that mother would "need to stabilize her emotions * * * before she will be ready to resume care of the children." In response to a question from DHS about whether mother might require a GAL, Basham wrote that he "was inclined to feel she does not require one, because there are times when she expresses herself well and is cooperative" but that "if she proves unable to work cooperatively with her attorney, then a GAL may be appropriate."

Kolbell's report further concluded that father lacked "substantial insight regarding the possible hazards and risks to [his] children" and has "difficulty accepting responsibility," evidenced by statements that his children were "brainwashed and bought with money" by DHS and that, "once they are home, things will be good." Further, the report reflected that, despite "extensive service attempts," father has "failed to sustain treatment [or] participate in critical elements" and had a "long pattern of being terminated from services without completing." Kolbell concluded that "there is nothing from any available records, extended interview, extensive testing, or combination of all this information that suggests that any further attempts at intervention, support, or treatment would likely produce any substantial, measurable change" in father's behavior and that father was "patently inclined to externalize blame and responsibility to others, including DHS, attorneys, the courts, and other service providers."

In March 2013, mother's attorney wrote a letter to Kolbell that requested Kolbell's opinion as to whether mother should have a GAL appointed for the upcoming termination trial. That letter is not part of the record, but Kolbell described it in a later hearing. According to Kolbell's description, mother's attorney wrote that, at a recent meeting with mother, she appeared to be confused about who was present during the meeting, and that she believed, as Kolbell put it, that a "big Washington law firm" was handling her case, and that all of her children wanted to return home, despite a lack of evidence that either contention was true.

Kolbell replied to the letter two weeks later, copying DHS counsel. That letter is part of the record. In the letter, drafted "specifically with respect to the issue of whether she needs a [GAL]," and after reviewing "all available information, including [his] neuropsychological evaluation" from six months prior, Kolbell opined that mother "lack[ed] substantial capacity to make decisions and participate meaningfully with her attorney in a way that reliably advances and protects her own self-interest." In drawing that conclusion, Kolbell noted: (1) that mother's "severe personality disorder *** renders it extremely difficult for [mother] to reliably

and consistently contain her emotions [and] \* \* \* maintain appropriate demeanor and behavior"; (2) that her personality disorder "renders her unable to consistently remain on track during conversations and discussions"; and (3) that her personality disorder "carries aspects of delusional thinking that, while not rising to the level of a \* \* \* diagnosable delusional disorder, at times becomes so severe that she is unable to practically distinguish reality from fantasy."

DHS moved to appoint a GAL for mother; a hearing was held on the motion in April 2013. It is unclear from the record why DHS, rather than mother's attorney, made the motion for a GAL; DHS's attorney noted that peculiarity to the juvenile court and acknowledged a "certain degree of discomfort" in making the request. Mother did not testify at the hearing, but her attorney conveyed to the court that mother objected to a GAL appointment.

Kolbell, though not able to observe mother's demeanor on that day, testified in support of the GAL appointment. When questioned by DHS's counsel as to why mother was unable to assist her attorney, Kolbell explained:

> "[S]he's unable to contain her emotions \* \* \* meaning that at times her emotions overwhelm her, well, rational and objective mind or thinking and subsequently can disrupt her behavior in such a fashion that it makes it extremely difficult for her to remain on point, on track, coherent and focused during conversations, discussions with her attorney, with myself, and presumably with others involved in her case.
>
> "\* \* \* \* \*
>
> "\* \* \*[W]hen she's asked a question and she begins an answer and the content of her response veers markedly away from the topic and the point, when she is brought back in with another question at the—along the lines of, 'Yes, but can you discuss the item that I asked in the question \* \* \* she continues to—to remain off track. \* \* \* I had difficulty at various points bringing her back on track when she had derailed."

When asked by DHS's counsel to provide an example of what Kolbell "saw as delusional thinking" in his letter, he replied,

"[F]or me to answer that question based on the—the examination of her sometime ago, * * * that's going to take me a little while to leaf through the dozen or so pages of handwritten notes that I've got. There's evidence provided by her attorney that suggests that she becomes—she may become patently delusional at times."

Asked to explain further, Kolbell recited examples from mother's attorney's letter to him:

"In looking at page three from [mother's attorney's] letter * * * he observes that a discussion with—with her regarding testimony that has occurred suggests that she—she (inaudible) that some people had been there which hadn't or some people hadn't been there which were. She maintains a belief that there was a—a big Washington law firm that was handling the case for her, but had no contact—[mother's attorney] had no evidence of that and that she—let's see. * * * Oh, she infers that all of her children are seeking to come home and live with her and her spouse, when available evidence that I have and I think [mother's attorney] suggests that that's not accurate."

Asked again by mother's attorney to review his "notes regarding * * * what [Kolbell was] saying is delusional thinking," Kolbell answered, "I think there's evidence from the records and including the letter that [mother's attorney] sent me that point towards delusional thinking."

At the close of the hearing, mother's counsel objected to the motion:

"[Mother] denies any sort of personality disorder, severe or otherwise. She thinks a [GAL] is absolutely inappropriate because, one, she can think for herself; two, she does respond appropriately; and, three, it's just totally unnecessary."

Mother's counsel also informed the court that mother had "asked [him] to withdraw" based on his correspondence with Kolbell and a "previous representation to the court" that he would seek a GAL. The record does not contain any more information about the circumstances or timing of mother's request, nor does the record reflect that the juvenile court addressed that issue; the same attorney continued to represent mother through the conclusion of the proceedings.

The juvenile court granted DHS's request and appointed a GAL for mother, finding that

> "[Mother] suffers from a mental disability or impairment. * * * [Mother's] disability or impairment renders her unable to give direction and assistance to her attorney on decisions that mother must make in this proceeding. * * * The appointment of a [GAL] is necessary to protect mother's rights in this proceeding, during the period of her disability or impairment."

Although the GAL statute also allows for a GAL appointment if the parent lacks substantial capacity "to understand the nature and consequences of the proceeding," the juvenile court made no finding that mother was unable to understand the nature and consequences of her termination proceeding. Rather, the juvenile court's finding appears to have been limited to mother's inability to give direction and assistance to her attorney.

A six-day termination trial was held in August 2013. Service providers and caseworkers who had worked with each of the six children testified to the conditions of the children at trial. Dr. Cordova, a psychologist who examined Si (who was 15 at the time of trial), diagnosed Si with adjustment disorder and anxiety, and said that Si had told Cordova that "she wished that her parents knew that she wants to just be a kid and get adopted," instead of caring for her younger siblings when parents were absent or fighting.

Dr. Munoz, a psychologist who examined C (who was 13 at the time of trial), testified that C was "ready to remain with her foster family" and that she "already began the process of psychologically divorcing from her parents." Munoz also explained that C had identified "her parents as being at-risk based on the history of using drugs" and that "she was skeptical as to her parents' ability to have her return." Munoz also said that permanency was "very important" for C.

A mental health service coordinator, Oberweiser, testified that the twin boys, M and Sh (who were nearly 12 at the time of trial), had "PTSD," "flashbacks," as well as "significant" aggression behaviors and special academic and communication needs. Sh's psychologist, Dr. Uchison,

explained that Sh's PTSD was the result "of a persistent stream" of "expos[ure] to domestic violence" over "a long period of time." Uchison also explained that, for children with PTSD, "[p]ermanency is extremely important."

M's psychologist, Dr. Wilson, testified that, after M was hospitalized, his improvement "was incredible," due to being removed from "the trauma that he had gone through" and receiving "individual attention, and *** really intensive services[.]" Wilson also testified that M had expressed "shame about who he was or about his behavior and also [had] a lot of anxiety about his mother and father's physical and verbal aggression."

Dr. Lim, who examined the youngest daughter, Sa (who was eight at the time of trial), described her as having adjustment disorder with mixed disturbance of emotions and conduct. Lim also testified that effects of violence in the home, substance abuse, and neglect rendered it "imperative that [Sa] have *** stability in—in her home life" and that "permanency seemed really necessary."

Dr. Eagle testified to her evaluation of the youngest son, A (who was six at the time of trial), and described him as having adjustment disorder, displayed through his "acting out and emotional symptoms, attention-seeking, whining, temper tantrums, sadness, [and] anger." Eagle testified that A has "intrusive thoughts," symptoms of trauma that "are characterized by an individual having unwanted thoughts about past highly negative, emotionally charged experiences."

At the time of the termination trial, neither parent had seen or spoken to any of the children in more than one year. When asked why the parents did not ask to set up phone calls or write letters, father testified that "it just got so complicated" and that DHS had presented impediments to doing so. Mother testified that the DHS caseworkers working with the family were lying about domestic conditions and that service providers were mischaracterizing her relationship with father.

By the time of the termination trial, father had completed a drug treatment program, although he had also

failed several UAs and did not provide others as required. Father had also engaged in some counseling, and mother had completed counseling and a parenting class, but neither parent had engaged in any domestic violence or batterers classes, which DHS identified as a priority. Father testified that he "already took care of that" after enrolling in a class after his 2006 conviction for assaulting mother. Mother, for her part, denied that domestic violence was a problem and insisted that parents needed marriage counseling instead, even though DHS had made clear that each parent needed to engage in individual domestic violence counseling as a condition of reunification with the children.

Both parents testified that they would like the twin boys—the highest-needs of the six children—to return home first, with the other children to return later if things were going well.

DHS presented evidence of mother's failure to engage in mental health services, despite DHS's attempts. As caseworker Salas described,

"Part of [mother's] engagement in services historically has been to threaten lawsuits, be physically aggressive, verbally threatening, posturing, getting in physical space. After—after failed services with [multiple service providers] for the same reason, many agencies weren't willing to take the risk of having [mother] entered into their services."

When DHS attempted to enroll the parents in the Oregon Health Plan so that services would be available to them after DHS's involvement ended, neither parent filled out the eligibility paperwork. Caseworker Salas also testified that "a huge topic throughout the life of this case" was that the numerous service providers who had interacted with mother believed that she needed to "be managed on medication," but mother refused.

Following the trial, the juvenile court entered judgments terminating mother's and father's parental rights. The court found, among other things, that both parents were unfit by reason of their continued conduct and conditions; that it was "extremely unlikely that the parents will ever truly acknowledge, let alone engage in any services to

change their behaviors or the conditions their conduct creates, thus, reintegration with parents within a reasonable time is improbable"; and that termination of parental rights "is the only opportunity left for the children to reach their full potential."

Among its findings of fact, the court noted that mother "demonstrated very oppositional behavior throughout the trial, including mouthing to a witness [a DHS caseworker] that she was going to sue that witness. [Mother] admitted later she had, in fact, threatened the witness and planned on following through with the threat." The court found that neither parent's testimony was credible; that father had a long history of substance abuse and that he "continues to abuse substances"; that the "ongoing emotional and physical domestic violence has created a 'combat' zone within the household that has permeated to the children, especially the twins, [M and Sh]"; that the children grew accustomed to being "hyper vigilant at all times, even in times when such vigilance harmed their ability to learn and socialize appropriately"; that both parents have had "multiple opportunities and resources to change their behavior" and that both parents have "either refused, been kicked out of, or declined those opportunities."

Both parents appeal the juvenile court's judgments. We address mother's case first. On appeal, mother makes 10 assignments of error. We briefly address the second assignment, which asserts that mother received inadequate assistance of counsel based on her attorney's role in obtaining the GAL appointment against mother's wishes. Although that claim is unpreserved, mother argues that it may be raised for the first time on appeal under *State v. Geist*, 310 Or 176, 796 P2d 1193 (1990). After this case was submitted, however, we decided *Dept. of Human Services v. T. L.*, 269 Or App 454, 456, 344 P3d 1123 (2015), in which we held that "ORS 419B.923 provides a trial-level mechanism to set aside judgments in dependency cases, and, because that remedy is available to challenge the adequacy of dependency counsel, *Geist* is inapplicable." *Id.* Our decision in *T. L.* forecloses further consideration of mother's inadequate-assistance claim in this appeal.

The remaining assignments of error challenge the juvenile court's appointment of the GAL. Mother argues that the appointment was erroneous and rendered her termination proceeding fundamentally unfair, and that the juvenile court consequently erred in terminating mother's parental rights as to each of her six children.

The state contends that mother's challenge to the GAL appointment is unreviewable because mother was required to, and did not, seek interlocutory review of that order. The state's argument rests on ORS 419A.200(1), which provides, in relevant part: "[A]ny person or entity, including, but not limited to, a party to a juvenile court proceeding *** whose rights or duties are adversely affected by a judgment of the juvenile court may appeal therefrom." For the purposes of ORS 419A.200(1), an appealable judgment includes a "final order adversely affecting the rights or duties of a party and made in a proceeding after judgment." *See* ORS 419A.205. The state argues that the GAL appointment adversely affected mother's rights because it "substantially changed the manner in which mother would be entitled to direct the course of the dependency proceeding."

Mother responds that the GAL order was not separately appealable because it was not "made in a proceeding *after judgment*." ORS 419A.205 (emphasis added). We agree that the state's argument overlooks the italicized language. Although the juvenile court's GAL order was made "in a proceeding," it was not entered in a proceeding "after judgment." *See, e.g., State ex rel Dept. of Human Services v. Sumpter,* 201 Or App 79, 85, 116 P3d 942 (2005) (concluding that a court order made during a termination proceeding was not appealable because the order "was entered after the petition to terminate mother's parental rights was filed but before mother's parental rights were terminated," and, thus, was not "an order 'made in a proceeding *after judgment*'" (emphasis in original)). In short, the order appointing mother's GAL was not appealable prior to the juvenile court's entry of judgment. It is, therefore, properly before us now.[2]

---

[2] Our conclusion that the termination proceeding was a distinct "proceeding" for purposes of applying ORS 419A.200 and ORS 419A.205 is buttressed by ORS 419B.231, ORS 419B.118(4), and ORS 419B.875(1)(a) and (b), all of which treat

The parties next dispute our standard of review applicable to the GAL appointment. Mother argues for the *de novo* standard of review that generally applies in termination cases. *See* ORS 19.415(3)(a) ("Upon an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall try the cause anew."). The state argues for a different standard. Citing *Dept. of Human Services v. K. L. W.*, 253 Or App 219, 221, 288 P3d 1030 (2012), the state argues that, in reviewing a juvenile court's appointment of a GAL, we are bound by the juvenile court's "findings of historical fact so long as there is any evidence to support them."

The question of the appropriate standard of review to apply to a juvenile court's GAL appointment in a termination case was left unanswered in *K. L. W.* In that case, the state apparently did not contest the applicability of a *de novo* standard; in light of how the parties framed the issue, we simply "assume[d] that we have discretion to conduct a *de novo* review," but we declined to exercise that discretion. *Id.* In this case, the state argues that *de novo* review is inappropriate. We conclude that we need not resolve the parties' dispute on that issue, however. That is so because, even under the more deferential standard that we typically apply to the juvenile court's rulings, the record is inadequate to justify the appointment of a GAL for mother. *See Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013) (explaining that "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome").

A juvenile court may not appoint a GAL for a parent unless the court finds by a preponderance of the evidence presented at the hearing that:

"(a)   Due to the parent's mental or physical disability or impairment, the parent lacks substantial capacity either to

termination-of-parental-rights proceedings as separate "proceedings" within the larger context of the juvenile code. We acknowledge (without deciding) that the analysis might be different in a case where a GAL order is issued *before* the beginning of a termination proceeding but *after* entry of a judgment in an earlier phase of a dependency case.

understand the nature and consequences of the proceeding or to give direction and assistance to the parent's attorney on decisions the parent must make in the proceeding; and

"(b)   The appointment of a [GAL] is necessary to protect the parent's rights in the proceeding during the period of the parent's disability or impairment."

ORS 419B.231(4). A "[p]reponderance of the evidence means that the facts asserted are more probably true than false." *State ex rel Dept. of Human Services v. T. F.*, 217 Or App 116, 122, 175 P3d 976 (2007) (internal quotation marks omitted). It is appropriate to appoint a GAL "when the parent's impairment prevents the parent from understanding what is happening or helping the parent's lawyer in the lawyer's representation of the parent." *K. L. W.*, 253 Or App at 227. On the other hand, "if the parent lacks some mental capacity, but is able to make decisions and to communicate with and act on the advice of his or her counsel, then the appointment of a [GAL] is unnecessary because the [GAL] could provide little, if any, service to the parent that would not be forthcoming from counsel." *Id.* at 227-28 (internal quotation marks omitted).

Our discussion in *K. L. W.* is illustrative. There, a father appealed a juvenile court's order appointing a GAL for the father's termination proceeding. *Id.* at 221. At the hearing, two witnesses were called: the father, and a psychologist, Morrell, who had conducted a "comprehensive psychological evaluation" of father two years earlier. *Id.* at 223. During the father's testimony, he was able to correctly testify to basic details but had difficulty answering and focusing on other questions. *Id.* When DHS's counsel asked whether the father had told a caseworker that somebody was "out to destroy him," father replied, "Sir, if you're being chased by guns and dogs at night * * * you'd be worried about who's after you." *Id.*

Morrell testified about his "observations of [the] father's testimony during the hearing," and concluded that the father's delusional disorder "would interfere" with his ability to make decisions regarding contesting the termination proceedings. *Id.* at 224. The court appointed a GAL, finding that the father "[did] not have the capacity to fully

understand and direct [his counsel's] efforts." *Id.* at 225. On appeal, we affirmed the GAL appointment because there was sufficient evidence to support a "finding that [the] father's disability rendered him unable to direct and assist his counsel." *Id.* at 228.

In this case, as noted earlier, the juvenile court did not find that mother was unable to understand the "nature and consequences of the proceeding." ORS 419B.231(4)(a). Nor does the state make such an argument on appeal. Rather, the disputed issue is whether mother lacked the "substantial capacity" to "give direction and assistance to [her] attorney." *Id.* Mother contends that the record was insufficient to establish such incapacity, arguing that (1) she did not testify at the hearing, so neither the court nor Kolbell observed her interactions with her attorney; (2) because Kolbell's psychological evaluation had been completed nearly six months earlier, "it did not speak to mother's current functioning at the time of the hearing"; (3) the purpose of that psychological evaluation was to assess mother's ability to parent, not her ability to assist her attorney; and (4) the fact that mother instructed her attorney to object to the appointment of a GAL shows that mother was able to track the proceedings sufficiently well to give "direction and assistance" to her counsel.

To recap the evidence that was before the juvenile court at the GAL hearing, DHS offered (1) Kolbell's neuropsychological evaluation of mother from six months earlier; (2) Kolbell's letter drafted in reply to mother's attorney's letter; and (3) Kolbell's testimony, including his description of correspondence with mother's attorney as to whether a GAL should be appointed.

For the following reasons, we conclude that that evidence was insufficient to support the appointment of a GAL. Unlike in *K. L. W.*, mother did not testify at the GAL hearing, so neither the juvenile court judge nor Kolbell was able to observe her demeanor or her interactions with her attorney. As a source of support, Kolbell's neuropsychological evaluation is problematic for two reasons. First, it was six months old at the time of the GAL hearing and, consequently, of limited value in assessing mother's competence

at the time of that hearing (at least, without any contemporaneous observation of mother that would have corroborated findings in the report). Second, Kolbell's report was written for the purpose of assessing whether mother could successfully reunite with her children and parent them appropriately. That is a different inquiry from whether mother could competently assist her attorney in the termination proceeding. Indeed, the fact that mother requested that her attorney withdraw after mother learned about his letter to Kolbell, and the additional fact that mother opposed the appointment of the GAL and could articulate why the appointment was unwarranted, provide some evidence that mother *was* able to provide direction in the matter of her legal rights and representation.

As for his testimony at the hearing, Kolbell said that mother's personality disorder rendered her unable to consistently "contain her emotions" and made it difficult for her to remain "on point, on track, coherent and focused" during conversations. Kolbell's letter in evidence also described how mother's disorder made it "extremely difficult" for her to "maintain appropriate demeanor." Although we agree that such behavior could present challenges for mother's attorney, many lawyers have difficult clients. Kolbell's description falls short of establishing that mother lacked "substantial capacity" to give "direction and assistance to her attorney." As we noted in *K. L. W.*, even "if the parent lacks some mental capacity, but is able to make decisions and to communicate with and act on the advice of his or her counsel, then the appointment of a [GAL] is unnecessary because the [GAL] could provide little, if any, service to the parent that would not be forthcoming from counsel." *Id.* at 227-28 (internal quotation marks omitted). Here, even if mother had challenges staying focused or containing her emotions, that does mean that she was unable to appreciate her own self-interest or communicate her wishes to her attorney.

Finally, to the extent that Kolbell suggested in his testimony and in his letter that mother was delusional, that suggestion appears to have been based on his interpretation of the letter that mother's attorney sent Kolbell in March

2013.[3] Kolbell did not offer examples of his own. In other words, the only evidence that mother was "delusional" at the time of the GAL hearing was Kolbell's description of what another person, mother's attorney, had purported to observe, under circumstances not fully known. And, notably, unlike *K. L. W.*, where a psychologist had diagnosed father with a delusional disorder, Kolbell, in his written evaluation of mother, concluded that, although mother's "[t]hought content was marked by elements of paranoid ideation," her thinking was also "free of frank delusions."

We conclude that the evidence was insufficient to support a finding that mother lacked "substantial capacity" to give "direction and assistance" to her attorney. Accordingly, the juvenile court's appointment of the GAL against mother's wishes was erroneous.

Mother next urges that the juvenile court's judgment be reversed because, in her view, the invalid appointment of a GAL rendered her proceeding "fundamentally unfair." The termination of parental rights is "'one of the most drastic actions the state can take against its inhabitants,' such that the court's termination of parental rights must be achieved consistently with due process." *K. L. W.*, 253 Or App at 232 (quoting *Geist*, 310 Or at 186); *see also State ex rel Juv. Dept. v. Burris*, 163 Or App 489, 495, 988 P2d 414 (1999) (Because "[p]arental rights are of paramount importance[,] proceedings affecting those rights must comport with due process."). Due process requires that the court's procedural safeguards ensure that a termination proceeding is fundamentally fair. *Id.*; *see also Geist*, 310 Or at 189 ("To secure a parent's rights in the context of those underlying determinations, courts seek to determine whether the proceedings were fundamentally fair." (Internal quotation marks omitted.)). "The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner." *Geist*, 310 Or at 189-90 (citing *Mathews v. Eldridge*, 424 US 319, 333, 96 S Ct 893, 47 L Ed 2d 18 (1976)). Fundamental fairness "emphasizes factfinding procedures. The requirements of

---

[3] Although Kolbell also made a passing reference to other evidence from "the records," he did not explain what records he was talking about or why they supported a conclusion that mother was delusional.

notice, adequate counsel, confrontation, cross-examination, and standards of proof flow from this emphasis." *Id.* at 190. This standard "is flexible and calls for such procedural protections as the particular situation demands." *Id.*

In a recent case, we concluded that a parent was denied a fundamentally fair termination proceeding where the parent was deprived of the "opportunity to be heard at a meaningful time and in a meaningful manner." *Dept. of Human Services v. S. C. P.*, 262 Or App 373, 382, 324 P3d 633 (2014) (quoting *Geist*, 310 Or at 190). In that case, a mother relinquished her parental rights to her children. She later moved to set aside the relinquishments, arguing that she had made the decision to relinquish her rights under duress. *Id.* at 377. Her attorney then moved to withdraw as counsel, citing a breakdown in communications and an ethical conflict. *Id.* at 377-78. The court first denied the mother's motion to set aside her relinquishments, and then denied counsel's motion to withdraw as "moot." *Id.* at 380. On appeal, the mother argued that she had been denied a fundamentally fair hearing. *Id.* We reasoned that, under the circumstances, the mother had effectively been forced to proceed "without attorney representation," and that "self-representation call[ed] into question whether the facts and legal arguments relevant to her claim of duress were properly presented to the court." *Id.* at 383-84. We concluded that the mother "did not have the opportunity to be heard at a meaningful time and in a meaningful manner," and had thus been deprived of "the procedural protections required for a fundamentally fair hearing." *Id.* at 384.

Similarly here, the erroneous appointment of a GAL impaired mother's ability meaningfully to defend against the termination petition. That is so for two reasons. First, as the state itself points out in arguing that the appointment of the GAL adversely affected mother's rights and, therefore, should have been appealed separately, "the appointment of a [GAL] substantially changed the manner in which mother would be entitled to direct the course of the dependency proceeding." Second, the very fact of the GAL appointment contributed to the evidence against mother in the proceeding. In her closing argument, an attorney for the twins, M and Sh, noted that "mother has needed a [GAL] to get through

these proceedings. That's highly unusual and certainly underscores the diminished level at which she's functioning." In addition, when the juvenile court issued its findings of fact supporting the termination of mother's rights, the court specifically cited, as evidence of mother's unfitness, the fact that a GAL had been appointed on her behalf.[4]

In conclusion, although we acknowledge that considerable evidence in the record supports the juvenile court's ultimate conclusion regarding mother's fitness, we further conclude that the erroneous appointment of mother's GAL rendered the termination proceeding fundamentally unfair. Accordingly, we must reverse the judgment terminating mother's parental rights and remand for further proceedings.

We turn now to father's appeal. Father assigns error to the juvenile court's findings that: (1) father was unfit at the time of the termination trial by reason of conduct or conditions that were seriously detrimental to his children; (2) the children could not be returned to father within a reasonable time; and (3) termination of father's parental rights to the twin boys, M and Sh, was in the best interests of the children. Again, our review of a termination judgment is *de novo*. ORS 19.415(3)(a).

ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

The statute sets out a two-part test. *See State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001). We must first address whether father is unfit by reason of conduct or condition seriously detrimental to the child. *Id*. To

---

[4] The significance of the GAL appointment can also be found in ORS 419B.231(5), which specifically provides that "[t]he fact that a [GAL] has been appointed under this section may not be used as evidence of mental or emotional illness in any juvenile court proceeding."

prove unfitness, the court must find that "(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is seriously detrimental to the child." *Id.* If we conclude that a parent is unfit, we next must find that the "integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." *Id.* That second part of the test for termination requires "the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home within a reasonable time." *Id.* at 145-46 (internal quotation marks omitted). Evidence of a parent's unfitness must be clear and convincing and will meet that standard if the evidence "makes the existence of a fact highly probable or if it is of extraordinary persuasiveness." *See* ORS 419B.521(1); *Dept. of Human Services v. K. M. M.,* 260 Or App 34, 44-45, 316 P3d 379 (2013), *rev den,* 354 Or 837 (2014) (quoting *State ex rel Dept. of Human Services v. A. M. P.,* 212 Or App 94, 104, 157 P3d 283 (2007)). If that standard is satisfied, "it remains to be decided whether termination is in the child's best interests." *Id.* at 45 (quoting *State ex rel SOSCF v. Hammons,* 170 Or App 287, 297, 12 P3d 983 (2000), *rev den,* 331 Or 583 (2001)).

The focus of both parts of the test for termination under ORS 419B.504 "is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Stillman,* 333 Or at 146. Accordingly, we must first "identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child." *Id.*

A parent's unfitness is assessed at the time of the termination trial. *Dept. of Human Services v. C. M. P.,* 244 Or App 221, 234, 260 P3d 654 (2011). Because children "have a right to grow up in a wholesome and healthful environment, * * * [w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide such an environment, the best interests of the child(ren) generally will require termination of that parent's parental rights." *Geist,* 310 Or at 189. Finally, we have recognized

that, "[a]t some point, the child's needs for permanence and stability in life must prevail." *Dept. of Human Services v. C. M. M.*, 250 Or App 67, 79, 279 P3d 306, *rev den*, 352 Or 341 (2012) (citing *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 58, 144 P3d 943 (2006)).

In father's case, the record overwhelmingly demonstrates that father was unfit at the time of his termination trial. First, he has engaged in conduct and is characterized by conditions that are detrimental to his children. Father's conduct and conditions include Antisocial Personality disorder; a history of threatening behavior, domestic violence, and drug abuse that persisted during the life of this case; erratic, unpredictable and unreliable behavior; and his consistent refusal to fully engage in prescribed treatment despite many attempts by DHS to provide it. Although father has made some efforts towards drug treatment and counseling, and DHS visitation logs indicate that, at times, he has had positive interactions with his children, at the time of trial, father had still not engaged in most of the recommendations DHS had made, particularly as to services that would address father's consistent problems with domestic violence. Father also continued to refuse to acknowledge that his troubled relationship with mother is a key reason why his children were removed.

Father's conduct and conditions, too, are clearly detrimental to his children. All six of his children have experienced, in some form, great stress, fear, and anxiety, among other problems, as a direct result of trauma experienced in their parents' home. At the time of the termination trial, it was the uncontroverted opinion of all of the professionals who testified that removal was beneficial to the children and that permanency was urgently needed.

*Stillman*'s second prong requires a showing that integration of the children back into the home is unlikely within a reasonable time. That is amply demonstrated in this case by the facts that father has not successfully completed most of the treatment required of him; that he lacks stable income and access to basic resources; and that, by father's own admission, neither he nor mother believe it would be a good idea to bring home all six children at once.

Rather, father would prefer to start with the twins—the *highest-needs* children of all—and then reunite an additional child into the home, one at a time, every three months, so long as the children were doing well. Given that the children have already experienced more than three years without permanency, and repeated prior removals from their parents' home over the last eight years, we conclude that "the child[ren's] needs for permanence and stability in life must prevail." *C. M. M.*, 250 Or App at 79.

Father's third assignment of error contends that it was not in the best interests of the twin boys, M and Sh, for the trial court to terminate his parental rights. ORS 419B.500 provides that the termination of parental rights is "for the purpose of freeing the ward for adoption if the court finds it is in the best interests of the ward." Further, because "[c]hildren have a right to grow up in a wholesome and healthful environment, free from fear of abuse, injury, or neglect," when a parent is unwilling or unable "to rehabilitate himself or herself within a reasonable time" so that the parent may provide a safe environment, "the best interests of the child(ren) generally will require termination of that parent's parental rights." *Geist*, 310 Or at 189.

In this case, service providers and psychologists testified that the twins are adoptable, that they desperately need permanency, and that they have greatly improved since their removal from their parents. Father has been unwilling to participate in the programs that would allow for his rehabilitation within a reasonable time so as to facilitate the twins' return home. The record establishes that the twins have suffered from the instability that father's parenting has caused and that their conditions improved upon being placed elsewhere and receiving treatment. We conclude that it is in their best interests to terminate father's parental rights.

For the foregoing reasons, the juvenile court's judgment terminating mother's parental rights is reversed and remanded. The juvenile court's judgment terminating father's parental rights is affirmed.

Judgment terminating mother's parental rights reversed and remanded; otherwise affirmed.